## DAVIS v. COMMONWEALTH LAND & LUMBER CO. et al.

### (Circuit Court, E. D. Kentucky.   August 31, 1904.)

1. COURTS—FEDERAL COURTS—FOLLOWING STATE DECISION.

Pending a number of suits to quiet title in a federal court by the owners of a large tract of land under a patent from the state which involved the question of the boundary of such tract, and after such question had been decided in two of the suits, an action in replevin to recover a number of·logs, between different parties, was instituted in a state court, and the issues were so made as to raise the question of the boundary of the same tract of land, and a decision of such question by the highest court of the state was obtained therein, which reduced the area of the tract nearly one-half from that given it by the federal decisions.   The owners of the land were not parties to such action, which was apparently brought for the purpose of obtaining such decision and was not seriously contested. *Held*, that the decision of the state court, while entitled to the highest consideration, was not binding on the federal court in the suits by the owners of the land which were still pending.

[Ed. Note.—State laws as rules of decision in federal courts, see notes to Wilson v. Perrin, 11 C. C. A. 71; Hill v. Hite, 29 C. C. A. 553.]

2. BOUNDARIES—CONSTRUCTION OF PATENT—FOLLOWING COURSE OF NATURAL OBJECT BETWEEN CORNERS.

The call for the third line of a boundary to the fourth corner, as given in a patent issued by the state of Kentucky, was from a stake on the top of Cumberland Mountain, "thence south, 60 degrees west, 8,320 poles, to a stake near Cumberland Gap."   If the course and distance be followed, the line would pass to the eastward of Cumberland Gap, through a portion of Virginia and several miles into the state of Tennessee.   If the crest of the Cumberland Mountain be followed the distance called for, it would fall short of reaching Cumberland Gap, and locate the fourth corner at a point on such crest to the northeast of the Gap.   *Held* that, both the third and fourth corners being points on the Cumberland Mountain, the line joining them ran with the top of such mountain for the distance called for, and not in a straight line following the given course, and that the fourth corner was at the point on the crest of the mountain 8,320 poles from the third corner as so measured.

3. SAME—RUNNING LINES BACKWARD.

While the boundary lines of a survey as given in a patent or deed may be run backward and in reverse order where necessary, because of an insurmountable difficulty in running them in their direct order, it is not permissible in doing so to disregard natural objects called for in the boundary, either as corners or lines.

4. SAME—QUANTITY.

In locating the boundary of a tract of land as given in a patent or deed, the question of quantity can only be considered where it cannot be located by natural objects, nor by following the courses and distances called for, or where it is necessary, in order to close the lines, to run some of them backward and in reverse order, and the number of unlocated corners and lines is such that there are alternative ways of closing, in which case the quantity given may be resorted to in determining which way shall be adopted.

5. QUIETING TITLE—RIGHT TO MAINTAIN SUIT—SUFFICIENCY OF EVIDENCE.

To entitle a complainant to maintain a suit to quiet title, he must show that defendant claims the land.   If complainant derives title through a deed containing exceptions, he must show that the land claimed by defendant is outside of such exceptions; but a lack of proof on his part in that respect may be supplied by evidence introduced by defendant.

6. ADVERSE POSSESSION—EVIDENCE.

Evidence considered, and *held* insufficient to sustain the defense of title by adverse possession in a suit to quiet title.

7. QUIETING TITLE—PROOF OF POSSESSION.

Evidence *held* to show possession by complainant in a suit to quiet title at the time the suit was instituted.

[Ed. Note.—Necessity of possession in suits to quiet title, see note to Jackson v. Simmons, 39 C. C. A. 522.]

In Equity.   Suit to quiet title.

Frank Chinn, D. W. Lindsey, and William Ayres, for Charles Henry Davis.

Helm, Bruce & Helm and W. F. Hall, for Commonwealth Land & Lumber Co.

COCHRAN, District Judge.   This is a suit by the complainant, Charles H. Davis, trustee, against the defendants, Commonwealth Land & 'Lumber Company, North Cumberland Manufacturing Company, Continental Land Company, and G. W. Bramlett, to quiet his title to certain land in Harlan county, Ky.   A decree pro confesso has been entered against the defendant companies.   The individual defendant, Bramlett, alone has answered the bill.   He does not assert title to said land in himself, but in his son, W. L. Bramlett, as purchaser at judicial sale in proceedings against the first-named company, whom he claims purchased for his benefit and on whose sale bond he is surety.

That land is a part of a certain tract of land granted by the commonwealth of Kentucky to John Ledford, Henry Skidmore, and Noble Smith by patent dated September 25, 1845, issued on a survey dated March 3, 1845, made under an order of the Harlan county court and conveyed, except so far as covered by senior patents and prior conveyances, November, 1870, by said patentees to complainant's grandfather, Edward M. Davis, through whom he claims, and is a part of that portion thereof outside of said senior patents and prior conveyances. Said senior patents are not identified in said conveyance, are quite numerous, and cover a large portion of the land within the boundary of said tract of land contained in the patent.   Said prior conveyances are very few, cover but a small portion of said land, and are specifically identified in said conveyance.   The description of said tract of land granted by said patent as set forth therein is as follows, to wit:

"A certain tract or parcel of land containing eighty-six thousand acres, by survey bearing date the 3d day of March, 1845, lying and being in the county of Harlan and bounded as follows, to wit:   Beginning on Crank's creek on two bushes and two sugar trees, beginning corner to said Smith's 1,500 survey; thence S. 70° W., 664 poles, to three beeches, beginning corner to Smith's 600-acre survey; thence S. 28° W., 400 poles, to a stake on the top of Cumberland Mountain; thence S. 60° W., 8,320 poles, to a stake near Cumberland Gap; thence N. 15° E., 3,200 poles, to a stake; thence N. 55° E., 8,820 poles, to a stake; thence S. 5° W., 3,150 poles, to the beginning."

The land to which complainant desires his title quieted is a part of the land contained within the following boundary, to wit:   Beginning at a double maple, two beeches, and two black gums, on the north side of the Clover Fork of the Cumberland river, about 20 poles from the same;   thence S. 80 degrees W., passing William Turner's at 80 poles,

in all 680 poles, to a sugar tree and hickory; thence south, crossing said fork, 480 poles, to a stake in the Little Black Mountain; thence west 1,920 poles, to a stake; thence north 480 poles, to a stake; thence N. 66 degrees E. 680 poles, to a stake on the Poor Fork; thence, running up the same, N. 80 degrees E. 1,920 poles, to a stake; thence, recrossing said Big Black, 960 poles, to the beginning—granted to Moses Cawood, under whom defendant asserts title as aforesaid by a patent issued January 28, 1846, on a survey dated March 6, 1845, made by virtue of an order of the Harlan county court of that date. This patent is three days junior to the Ledford patent, and states that said boundary contains 9,500 acres. Complainant claims that the whole of this tract is within the boundary of the Ledford patent; that 4,500 acres thereof is within that portion of said patent covered by senior patents; and that as much as 5,000 acres thereof is within the portion of said patent not covered by senior patents or prior conveyances. It is this latter portion of said Cawood patent that complainant claims, and his title thereto that he seeks to have quieted herein.

The defendant denies that the whole of the Cawood patent is within the Ledford patent, or that as much as 5,000 acres thereof is within said portion thereof outside of the senior patents. In his answer he states that he has not sufficient knowledge or information to form a belief as to whether any part thereof is within that part of the Ledford patent outside of the senior patents, and denies that exceeding 1,000 acres thereof is within such part of the Ledford patent. According to the evidence as presented by him, a part of the Cawood patent is within the Ledford patent, possibly as much as one-third thereof. The defendant does not take the position, either in his pleading or evidence, that no part of the Cawood patent is within that part of the Ledford patent outside the senior patents, and hence that no part of the land claimed by him is within any part of the land claimed by complainant. His not doing so conduces to show that his real position relates to the extent that his claim is within complainant's. The extent that the one claim is within the other claim, and hence of complainant's right to relief herein, if he is entitled to relief, depends primarily on the question as to how much of the Cawood patent is within the Ledford patent. In order to settle it, both patents must be located. There is no dispute as to the location of the Cawood patent. There is as to that of the Ledford patent. And this is the principal controversy in this case, to a consideration of which I will at once proceed. What, then, is the true location of the Ledford patent?

At the threshold of this question, we are met with the contention by defendant that the Court of Appeals of Kentucky, in the case of Creech v. Johnson, 76 S. W. 185, 25 Ky. Law Rep. 659, has located the Ledford patent, and that this location is conclusive on this court. The first proposition is conceded; the second is disputed. Is this court, then, conclusively bound by the location of the Ledford patent made in that case? Is it thereby foreclosed from investigating and determining the true location of said patent on its merits? That case was this: It was an action by one Johnson and two Jacksons against two Creeches to recover possession of 222 poplar logs alleged to have been wrongfully detained by defendants from the plaintiffs and $400 for the wrong-

ful detention thereof. The petition alleged that they were cut by defendants from 50 acres of unoccupied land of which the plaintiffs were the owners. The defendants denied that the plaintiffs were the owners of said land or logs, and alleged affirmatively that the plaintiffs claimed said land under a patent which issued in 1902 on a survey made in that year, and that same was void because it was embraced by the Ledford patent, under which the complainant herein claims, and also by a patent to one Boyd Dickinson issued more than 40 years before. These affirmative allegations were denied by the plaintiffs. The lower court rendered a money judgment in favor of plaintiffs against defendants for the sum of $256. This judgment was affirmed by the Court of Appeals. The action was brought September 22, 1902, one month and fourteen days after this suit was brought, which was on August 8, 1902. Judgment in the lower court was rendered June 2, 1903. The appeal was docketed at September term, 1903, of the Court of Appeals, submitted September 29, 1903, on motion to advance, and disposed of October 14, 1903. After this action was brought, and before its final disposition, five other suits were brought in this court by complainant against other claimants to parts of the same land, including said Creeches, which suits are still pending. I cannot resist the conclusion that the object of that action was to bring about a construction of complainant's patent by the Court of Appeals of Kentucky adversely to complainant's contention as to its true location, in order that such construction might be availed of in this and the other suits pending in this court as a bar to the view that it might have as to such location. The situation existing at the time the action was brought, the proceedings had in it, and the reasons given, on the motion to advance it in the Court of Appeals, for its being advanced, all conduce to this end.

This court had in two suits prior to the pending litigation herein in regard to said patent construed it. Judge Barr had construed it in 1894 (Davis v. Farmer [D. C.] 141 Fed. 703), and Judge Evans in 1900 (Davis' Heirs v. Hinckley [C. C.] 141 Fed. 708). They placed the same construction upon it, which was adverse to the construction thereof advanced by the defendants in said pending litigation. This construction had been acquiesced in by the defendants in the prior litigation. It was reasonable to conclude that this court would adhere to its former construction if things remained as they had been. A possible, if not probable, ground of getting it to change its construction, was to obtain a construction by the Court of Appeals before the pending litigation could be prepared and brought to a hearing, upon the idea that it was a question of local law and this court would be bound by that construction. Such was the situation when said action was brought. Then, as to the proceedings had: Many of the steps in it were taken by agreement of the parties. Though a common-law action, it was agreed that it might be tried by the court upon depositions; the taking of the depositions was by agreement, and what one witness would swear to was agreed to; instead of bill of exceptions, an agreement was filed as to the evidence heard in the lower court; and in the Court of Appeals both sides concurred in the motion to advance. Still further, plaintiffs' case was made out by introducing his 50-acre patent and proving that the logs were cut from its bound-

ary and their value. This they did. But they did not rest here. They voluntarily reduced their claim to 64 logs, of the value of $4 apiece, cut from 17 acres of said 50-acre patent, by proving that the rest thereof was covered by senior patents, and then took upon themselves the burden of showing that said 17 acres was not embraced within the Ledford patent, under which complainant claims. But, though defendants had alleged that it was within the Boyd Dickinson patent, also, they did not undertake to show that it was not, contenting themselves with attempting to show only that it was not within the Ledford patent. This they attempted to do through the surveyor on whom defendants rely herein in support of their contention as to the true location of the patent. On the other hand, the defendants introduced no evidence whatever. They did not attempt to show that said 17 acres was within the Ledford patent, nor did they dispute plaintiffs' evidence as to the number of logs cut from the 17 acres or their value. As stated before, the action was for the recovery of the logs. No claim was made that defendants had converted them to their own use, nor was evidence introduced to that effect. There was no prayer for a money judgment, save as to damages for wrongful detention. The judgment was for $256, the value of the 64 logs at $4 apiece. It should have been for the logs themselves, if to be had, and, if not, for their value. This error in the judgment was not called to the attention of the Court of Appeals, and the judgment sought to be reversed on this ground. Finally, as to the reason given for having the case advanced in the Court of Appeals: It is as follows:

"This case involves the location of a patent which, if located according to the contention made by the patentees and those claiming under them, will include about 300 square miles and dispossess a population of about 15,000 souls. The location of this patent was before this court at the last term in the case of Asher v. Howard, reported in 70 S. W. 277, 24 Ky. Law Rep. 961, where your honors declined to pass on the question of location on the ground that the interests were large and the facts not so brought out as to enable the court to pass intelligibly upon the questions. This case has been prepared for the purpose of obviating that difficulty and presenting to the court all the facts necessary to enable it to locate the patent. The magnitude of the tract of land and the extent of population alone make it a public question, and while not within the exact language of rule 16 of this court the case is within the equity of that rule, because the question has recently been considered, but not adjudicated, by the court. There are many cases pending, both in the state and federal courts, concerning the location of this patent. Under these circumstances we feel that the court will grant the request made by both parties to the appeal to advance the case."

Here is an express avowal that the case had been prepared for the purpose of enabling the Court of Appeals to locate complainant's patent, which it had refused to do in a former case. And the patent is desired to be located, not particularly to serve the interests of the parties to that litigation, but of others in no way connected with it. Certainly, in view of all this, I am warranted in concluding that the sole purpose of that litigation was to bring about a construction of the complainant's patent; and I think there is not much reason to doubt but that it was for the purpose of securing a construction adverse to complainant.

It remains, then, to be considered whether this court is bound by

that construction obtained in this way. Certainly complainant is not bound by that construction. I mean by this that the judgment in that case could not be pleaded by way of·estoppel against him by the parties· to it or by any one else. This, because he was no party to that litigation. By the construction put upon his patent therein, it is cut half in two from what he claims it to be and from what it was adjudged to be by this court on the two occasions referred to in suits to which he was a party and which were fought out at arm's length by the parties thereto. The land covered by the patent as he claims it to be and as it was so· adjudged is worth probably more than a half million of dollars, and since 1870, when the original patentees parted with their title thereto to his grandfather, Edward M. Davis, the latter and those claiming under him have paid over $25,000 in state and county taxes. There is no good reason here, then, for making an exception to the rule that one is not estopped by a judgment in a suit to which he is not a party. If this case were in the state courts, they would not hesitate for a moment to lay aside the decision in the Creech-Johnson Case and deal with it as if that case had never arisen. If it were before the Court of Appeals as it is before me, it would blot that case from its memory, so as not to be affected or influenced by it to the slightest degree in passing upon complainant's rights. Is this court, then, bound by that decision when the state courts are not? Was complainant's sole remedy, after that case was decided, in order to get a hearing of his contention on its merits, to abandon this suit and go into the state courts? I think not. I think this court is just as free as the state courts to consider the matter on its merits.

The defendant in support of his position relies on the well-known doctrine that the federal courts are bound by the decisions of the state courts in matters of local law. He cites the following cases as applying that doctrine to a case of this kind, to wit: Preston v. Bowmar, 6 Wheat. 580, 5 L. Ed. 336; Suydam v. Williamson, 24 How. 427, 16 L. Ed. 742; Henderson v. Griffin, 5 Pet. 151, 8 L. Ed. 79. Each of these cases was an action of ejectment. In the Preston-Bowmar case plaintiff's right of recovery depended upon the location of the patent under which he was claiming. He had theretofore brought an action in the state court and lost it. In those days a judgment in ejectment was not a bar to another suit in ejectment. Hence it was that he was able to sue again, and he brought his suit in the federal court. A judgment dismissing his suit there was affirmed. The Supreme Court did not so act because it considered itself conclusively bound by the judgment of the state court in the former suit, but because the location of the patent which it made could not be pronounced unreasonable or founded in clear mistake. In the Suydam-Williamson case plaintiff's right of recovery depended upon whether the title under which he claimed had been divested by certain proceedings had in the state court. It had been decided in the highest state court that it had been. But this had been so decided, not simply in a single case. It had been so decided in at least two, and possibly more, cases. Besides, in all those cases the position of the plaintiff in regard thereto had been represented by those under whom he claimed, and that with an earnest effort to have that position upheld; and Mr. Justice Camp-·

bell placed stress upon the fact that the persons whose titles had been so attempted to be divested by those proceedings were "children under the superintending care of the parental jurisdiction of the state." In the Henderson-Griffin case plaintiff's recovery depended upon whether it was barred by the statute of limitations. It was, unless it came within an exception to the effect that, if the plaintiff had discontinued a former suit, then he or any one claiming by, from, or under him might bring another suit within a certain period. A former suit had been brought in the state court by parties named as trustees in a trust executed by the statute of uses. That court decided that the plaintiffs had no right of action, and the suit was thereupon discontinued. Thereafter the suit in the federal court was brought by the cestuis que trustent in said trust. It was held that they did not claim by, from, or under the plaintiffs in the state court, and hence the case did not come within the exception, and the suit in the federal court was barred by the statute of limitations. The decision of the state court did not involve any question decided in the suit in the federal court. It was simply accepted as the law and held that, notwithstanding plaintiffs had title under the decision by the state court, their right of action was barred by the statute.

There is nothing, therefore, in either of these cases that justifies the position that a decision of the Court of Appeals of this state, which, if binding, will take from a noncitizen thereof one-half of a very valuable property claimed by him, upon which he and his family for over 30 years have paid taxes amounting in the aggregate to a very large sum of money, rendered in a suit to which he was not a party and of which he had not the slightest notice, involving the title of 64 poplar logs, worth not exceeding $256, and in which, though his title was set up, it was not defended and was put forward for the purpose of being shot down, is conclusive upon him as to his rights, or necessitates an abandonment of a suit which he has pending in this court with all the rights accruing to him thereunder to prevent its being so. The following cases, to wit: Carroll v. Smith, 111 U. S. 556, 4 Sup. Ct. 539, 28 L. Ed. 517; Gibson v. Lyon, 115 U. S. 439, 6 Sup. Ct. 129, 29 L. Ed. 440; Barber v. Pittsburg, etc., Ry. Co., 166 U. S. 83, 17 Sup. Ct. 488, 41 L. Ed. 925—are authorities against any such position. In the Carrol-Smith case Mr. Justice Matthews said:

"The decision in Hawkins v. Carroll Co., 50 Miss. 735, above referred to, is not a judgment of the Supreme Court of Mississippi construing the Constitution and laws of the state, which, without regard to our own opinion upon the question involved, we feel bound to adopt and apply in the present case. It is a decision upon the very bonds here in suit, pronounced after the controversy arose and between other parties. It was not a rule previously established, so as to have become recognized as settled law, and which, of course, all parties to transactions afterwards entered into would be presumed to know and to conform to. When, therefore, it is presented for application by the Courts of the United States, in a litigation growing out of the same facts, of which they have jurisdiction by reason of the citizenship of the parties, the plaintiff has a right, under the Constitution of the United States, to the independent judgment of these courts, to determine for themselves what is the law of the state by which his rights are fixed and governed. It was to that very end that the Constitution granted to citizens of one state, suing in another, the choice of resorting to a federal tribunal."

The Gibson-Lyon case was an action of ejectment. A prior action in ejectment had been brought in the state court by the vendor of plaintiff and decided against him. Mr. Justice Matthews stated that defendant contended that this judgment of the state court—

"If not entitled to the force of an estoppel, is at least an authoritative decision of the highest court of the state upon the law of the case, which, as it involves only questions of title to real estate within its territory dependent on its local jurisprudence, ought to furnish the obligatory rule of decision for the courts of the United States."

, He responded to this contention in these words:

"As a precedent, the decision of the Supreme Court of the state, though single, is entitled to peculiar respect, because all the questions decided arise upon the local law of the state; but it cannot have conclusive force in the courts of the United States, unless it has become a rule of property."

He then proceeded to consider the question as to plaintiff's right on its merits, but disposed of it in the same way the state court did.

The Barber-Railway Co. case was also an action of ejectment. Plaintiff's right to recover depended on the construction of a devise in a will. That devise had been construed by the Supreme Court of the state in a prior action of ejectment, and the question was as to the effect of its judgment. Mr. Justice Gray said:

"The decision of the Supreme Court of Pennsylvania, in the former action of ejectment, is certainly not conclusive as an adjudication of the rights of the parties, inasmuch as a single verdict and judgment in ejectment, not being conclusive under the laws and in the courts of the state, is not conclusive in the courts of the United States, and no bar to the second action of ejectment. * * * The question whether the opinion of the Supreme Court of the state in the former action is conclusive evidence of the law of Pennsylvania in a court of the United States depends upon the further question whether the opinion is declaratory of the settled law of Pennsylvania as to the effect of such devises, or is a decision upon the construction of this particular devise. When the construction of certain words in deeds or wills of real estate has become a settled rule of property in a state, that construction is to be followed by the courts of the United States in determining the title to land within the state, whether between the same or between other parties. * * * But a single decision of the highest courts of a state upon the construction of the words of a particular devise is not conclusive evidence of the law of the state, in a case in a court of the United States, involving the construction of the same words, between other parties, or even between the same parties or their privies, unless under such circumstances as to be an adjudication of their rights."

It must be held, therefore, that the opinion of the Court of Appeals of Kentucky in the Creech-Johnson case is not conclusive on this court as to the true location of complainant's patent. The mere fact that prior thereto such location had been determined by this court on two occasions, and this location was held to be erroneous in the Court of Appeals in that case, does not give the opinion therein any more force than it would be entitled to if such location had not been so determined. It is, however, the duty of this court to treat that opinion with respect, to examine the reasons given for the conclusion reached in it and weigh them carefully, and not to depart therefrom lightly, but only upon the deepest conviction that it has fallen into error. This I will do.

I recur, then, to the question which I started out to consider, and that is, as to what is the true location of the Ledford patent. In order to

locate a boundary of land contained in a deed or patent, it is essential to first interpret the words used in describing the boundary and determine their meaning, or, in other words, to ascertain what boundary is called for thereby. The patent calls for six lines and six corners. The first corner is two beeches and two sugar trees in Crank's creek, the beginning corner of Noble Smith's 1,500-acre survey. The second corner is three beeches, the beginning corner to a 600-acre survey of said Noble Smith. The other four corners are stakes. The third corner, or first stake corner, is located "on the top of the Cumberland Mountain." The fourth corner or second stake corner, is located "near Cumberland Gap." The other two stake corners are not located, save so far as they are located by the courses and distances called for in the lines leading to them.

Now, the first two corners—the beech-sugar tree corner, beginning corner of the Smith 1,500-acre survey, and the beech corner, the beginning corner of the Smith 600-acre survey—are known objects and can be readily found by one going on the ground. The fixing of these two corners fixes the first line, which, according to the true interpretation thereof, nothing else appearing, is a straight, or, as the old ejectment lawyers would term it, a rectilinear, or right, line, between those two corners. The patent boundary undertakes to give the course and distance of this line. According to that, its course is S. 70° W. and its distance 664 poles. But actual running and measurement of that line, making due allowance for variation in the magnetic meridian, shows that such is not the true course and distance of said line. It runs further south and is longer than is there given. Complainants's surveyors testify that it runs S. 66½° W., and defendant's surveyor that it runs S. 67½° W.; thus differing by one degree. The former testify that its length is 920 poles, or 256 poles longer than given in the patent; the latter that its length is 911.5 poles, or 247.5 poles longer than so given, thus differing by 8½ poles. In locating this first line, according to the rule of preference governing in such cases, by which the order of preference is natural objects, artificial objects, adjacent lines, courses, distances, and, lastly, quantity, the line given in the patent as the first line, limiting ourselves to the course and distance, must be rejected, and the straight line between the two known natural objects constituting the first and second corners accepted as the first line thereof.

When we come to the second line, there is no doubt as to its meaning and true interpretation. It is a straight line between the second corner, three beeches, and a stake on top of Cumberland Mountain. But it cannot be located, as in the case of the first line, by first locating the corners and then drawing a straight line between them. This, because the third corner, the stake on top of Cumberland Mountain, is not to be found. Hence we must pursue the opposite course, and locate the corner by first locating the line; and we locate the line by running the course called for in the patent, which is S. 28° W. Where that line strikes the top of Cumberland Mountain is the third corner. By actual measurement, the distance is longer than called for in the patent, to wit, 400 poles. Complainant's surveyors testify that it is 424.12 poles, and defendant's surveyor that it is 463.4 poles, thus differing by 39.28 poles.

So far there is not the slightest difficulty in locating the patent. Both

sides are agreed. It is out of the third line that the supposed difficulty in locating the patent arises. Here we must first interpret the call for that line, and in so doing we must go to the very root of the matter. Splitting this call up into its elements, we find that it calls for three things in relation to said line. It calls for us to go from a stake on top of Cumberland Mountain to a stake near Cumberland Gap, it calls for a course S. 60° W., and it calls for a distance of 8,320 poles, or just 26 miles. What, then, does the first call, to wit, from a stake on top of Cumberland Mountain to a stake near Cumberland Gap, mean? We are here, I opine, at the very heart of this controversy. Settle this matter correctly, and this case is settled so far as the question as to the location of the Ledford patent is concerned.

Just here, then, let us retire from the center to the circumference— from the unknown to the known—and then come back to the center again. In the first place, I think it can be safely laid down that a call from one object to another object is a call, nothing else appearing, for a straight or rectilinear or right line between and connecting the two objects. But, whilst this is so, it is not necessarily so. It is so, nothing else appearing. It is consistent with this call that the real line between and connecting the two objects is not such a line. In the case of Lyon v. Ross, 1 Bibb, 466, a parent had divided his land by deed between his two children. The partition line called for therein ran from corner to corner, without mentioning any intervening object. One pole distant from a rectilinear line between the two corners was a spring. It was proven that the line as run in making the division passed through the center of this spring, so as to afford to both farms the use of water from the spring. The question was, as stated by Judge Boyle, "whether a mathematical line, the shortest distance between the two corners, or the line as actually run," was to be deemed the boundary between the two places. It was held that the line actually run was. Judge Boyle said:

"In surveys, where a line in fact has not been run, or, if run, no objects existed on the direction of the line to give it locality, or those that existed, being of perishable nature, have become extinct, to ascertain the line in question, the course called for must, of necessity, be adopted as the only practicable mode; but, when ascertained and marked by natural or artificial objects, it would seem most reasonable that it should remain to be considered as the proper boundary of the survey, notwithstanding it might afterwards be found to deviate somewhat from a rectilinear direction. To substitute the rectilinear line, instead of the line actually run and located by natural or artificial objects, as the test of right between parties, would be subjecting men to the inconvenience of being governed by a rule which was invisible and untangible, and capable of being known but by few, instead of being governed by a rule which is an object of sense, and equally capable of being known to all. In the present case, as the proof is unquestionable that the line actually run passed through the middle of the spring, we cannot hesitate to say that the spring ought to be taken as the boundary between the parties, and that the complainants are entitled to a moiety thereof."

This decision may be thought to be questionable, as permitting parol evidence to vary a deed. But, whether so or not, it must be accepted that if the call is from one point in a continuous object, natural or artificial, to another point in the same object, the line between and connecting the two points follows the sinuosities of such object, if not straight,

and is curved or zigzag as the case may be.   And this is so, whether the call is simply from point to point, without further reference to the object, or is more definite, and says that in going from the one to the other you go with or follow the object.   In such a case it cannot be said that parol evidence is admitted to vary the writing; for it is a cardinal rule in the construction of a writing that it is to be construed in the light of existing circumstances, and in such a case the continuous object between and connecting the two points called for is a part of the existing circumstances.   In view of it, the call to run between the two points is construed to run with it, though it is not so expressed.   A good instance of the application of this in the case of an artificial object may be found in the case of Whitaker v. Hall, 1 Bibb, 79.   In that case Judge Bibb, in his usual vigorous style, said:

"We have no difficulty in deciding it as a general rule that, when an entry calls for a road or trace, and has reference to an intermediate distance between the two objects on that road, the meanders, and not a direct line, must govern the admeasurements.   When a road is mentioned, and a distance to an object on it, the mind of every man of common sense takes the road, and follows it as the safest and most infallible guide."

Here the call was "along the road," but it was held that that was not essential.   A good instance of the application in the case of a natural object may be found in the case of St. Clair Co. v. Lovingston, 23 Wall. 46, 23 L. Ed. 59.   In that case Mr. Justice Swayne said:

"It may be considered a canon in American jurisprudence that where the calls in a conveyance of land are for two corners at, in, or on a stream or its banks, and there is an intermediate line extending from one such corner to the other, the stream is the boundary, unless there is something which excludes the operation of the rule by showing that the intention of the parties was otherwise."

And it is well settled that the mere fact that the connection between the two points in the natural or artificial object consists of a line or series of lines whose courses and distances are given, which do not correspond with the sinuosities or meanders of the continuous object in question, is not sufficient of itself to show that it was the intention of the parties that the two corners should not be connected by such sinuosities or meanders. In the Whitaker-Hall case, supra, Judge Bibb added to the quotation we have made from his opinion the following, to wit:

"Where a mathematical point is required on a road at a given distance, common sense would blush for that sophistication which would attempt to find it by taking the bearings and distances along the meanders of the road, protracting, taking the given distance with the dividers, and applying it to the plat, taking the course of the direct line, then running the line according to this experimental course, and measuring the distance on the ground.   And when this direct line, so taken, was applied to the ground, the distance would fall short of or overreach the road, by reason of the inaccuracy of instruments, or because the meanders of the road had been taken, not on a perfect plane, or because the direct course was over an uneven surface, and thus the operator must begin again to search for the point required; whereas the first admeasurement along the meanders of the road would have at once ascertained the point required."

In the case of Bruce v. Taylor, 2 J. J. Marsh. 160, the calls of the patent were to begin on the Ohio river and then for certain courses and distances without any corner or marked line to the mouth of

141 F.—46

Kinnekenick, a stream emptying into the Ohio, and then certain courses and distances, without any corners or marked lines, to a stake on the Ohio river, and then for courses, distances, and corners from the river round to the beginning. If the patent was construed to bind on the river and run with its meanders from the beginning to the mouth of Kinnekenick, and thence to the stake on the river, it included the land in controversy in that case; but if the courses and distances up the river controlled and were established as the boundary, then the patent did not include that land. The former was held to be the true construction of the patent. Judge Robertson said:

"It is our opinion that the river is the boundary. The beginning is on the river. The mouth of Kinnekenick is on the river. The stake called for is on the river. The intermediate courses are in the general direction of the river. No corners are called for. The courses and distances are not accurate, but such as would be called for when intending that the river should be the boundary. The surveyor would not be particular in ascertaining by his compass the exact course, nor with his chain the precise distance."

Then in St. Clair Co.-Lovingston case the calls of one of the surveys construed therein were as follows, to wit:

"Beginning on the Mississippi river, opposite to St. Louis, from which the lower window of the United States storehouse in St. Louis bears N. 70¾° W.; thence S. 5° W. 160 poles, to a point in the river from which a sycamore 20 inches in diameter bears S. 85° E.; 250 links; thence S. 35° E. 130 poles, to a point; thence N. 15° W. 170 poles, to a forked elm on the bank of Cahokia creek; thence N. 85° W. 70 poles, to the beginning."

It will be noted that here was a call from a definite point on the bank of the river to a definite point in the river. It was not said as to whether the line was to run with the bank or with the river. The sole defining of the line, otherwise than due to the terminal points called for, was the course and distance given. It was held that the river was the line. Mr. Justice Swayne said:

"It will be observed that the beginning corner is on the bank of the river. The second corner is a point in the river. The line between them is a straight one. Where the course described would have fixed the line does not appear. There was an obvious benefit in having the entire front of the land extend to the water's edge. There was no previous survey or ownership by another to prevent this from being done. No sensible reason can be imagined for having the two corners on the river and the intermediate line deflect from it. Under the circumstances we cannot doubt that the river was intended to be made, and was made, the west line of the survey. In the light of the facts, such is our construction of the calls of the survey, and we give them this effect."

With these principles well settled, how is the call in question to be construed? If the call had been from the stake on the top of Cumberland Mountain to another stake on the top thereof, definitely fixed, there would be no question but that the line between the two stakes would run with the top of the mountain, though it was not so expressed, and notwithstanding whatever relation thereto the course called for bore. If it did not coincide with the top of the mountain, it would have to be rejected. It could not control the location of the line or affect it. So, if the call had been from the stake on top of Cumberland Mountain to Cumberland Gap, the same result would follow. For Cumberland Gap is a feature of the top of Cumberland Mountain. It is a break therein.

So, likewise, would it follow, if the call had been from the stake on top of Cumberland Mountain to another stake on top thereof near Cumberland Gap. Does, then, any different result follow from the mere fact that, instead of the call being either one of these three, it is a call from the stake on top of Cumberland Mountain to a stake near Cumberland Gap? Does that not mean a stake on top of Cumberland Mountain near Cumberland Gap? I think it does. It cannot reasonably mean anything else. The call means to run with the top of Cumberland Mountain to a stake on the top thereof near Cumberland Gap. That such is the true meaning of this call is enforced by considering by way of illustration only the first three calls of the conflicting patent involved in the suit by complainant against Farmer and others (141 Fed. 703), in which Judge Barr construed and located complainant's patent. That patent was issued July 15, 1846, on a survey made March 3, 1845, apparently on the same day that complainant's survey was made. His survey was made by the surveyor, James Farmer, and that by the deputy surveyor, W. C. Farmer, nephew of the former. Its first three calls are as follows, to wit:

"Beginning at two Spanish oaks and black oak on top of Cumberland Mountain. in the Chadwell Gap, near the head waters of Martin Fork, near a cliff of rock west of the trail leading across said mountain; thence S. 71° W. 140 poles, to a hickory on top of mountain; thence S. 72° W., with the top of said mountain, W. 2,560 poles, to a stake near Cumberland Gap."

Here the beginning corner on top of the mountain is more definitely fixed than the third corner in the Ledford patent. It is two Spanish oaks and black oak, in Chadwell Gap, near the head waters of Martin Fork, near a cliff of rock, west of the trail leading across the mountain. The second corner is a hickory on top of the mountain. The course and distance of the first line is given, and it is not said that it runs with the top of the mountain. But is it not certain that it does so wherever the course and distance will take one? The third corner is a stake near Cumberland Gap, just as in the Ledford patent the fourth corner is a stake near said Gap. It is not said, any more than here, that the stake is on top of the mountain. It is said, however, that the second line runs, not only a certain course and distance, but "with the top of said mountain." Does not, therefore, this line run with the top thereof, wherever the course may take one? Clearly so. Now, though the matter is not so definitely expressed, I think it is equally clear that the third line of the Ledford patent, from the stake on top of Cumberland Mountain to a stake near Cumberland Gap, runs with the top of the mountain and thence to a stake on top thereof, wherever the course called for, to wit, S. 60° W., may take one. We are not authorized to abandon the top of Cumberland Mountain for it; for it is a commonplace that courses and distances must yield to objects called for, and particularly to natural objects as to whose location there cannot be the slightest doubt. Particularly should we not abandon the top of the natural object thus called for, in the light of the consideration that to do so would run us out of the state of Kentucky into the states of Virginia and Tennessee. From Cumberland Gap west the top of Cumberland Mountain is the dividing line between the states of Kentucky and Virginia. At Cumberland Gap those states and the state of Tennessee corner. If a line is run from

the stake on top of Cumberland Mountain—the third corner of the Ledford patent—S. 60° W. 8,320 poles, it will take one across the wedge of Virginia, between Kentucky and Tennessee, running to Cumberland Gap, into Tennessee, on Powell river, 4⅓ miles southeast of Cumberland Gap. Kentucky had no right to grant land outside of its borders. This consideration therefore removes all possible ground for claiming that the course called for and distance along the course has any bearing whatever in fixing the third line of the Ledford patent.

We think, however, that entirely too much stress is placed upon this consideration. It is not a controlling consideration in fixing that line. It is simply a confirming one. The line would have to be where we have fixed it, to wit, on the top of Cumberland Mountain, even if such consideration did not exist, and Kentucky and Harlan county thereof extended south of Cumberland Mountain and took in the territory where said course and distance will take one. In the Bruce-Taylor Case, above, there was a similar confirming consideration. If the courses and distances called for between the corners on the Ohio river were run out, some of them would take one across the Ohio river into the state of Ohio. This fact was alluded to as confirming the construction of the patent necessitated by the other considerations in the case. Judge Robertson said:

"In this case there is a manifest mistake in the calls of the patent for course and distance. If they must be literally pursued for ascertaining the boundary, much of the land which the patent will be made to include will be covered by the Ohio river, and some of it will be in the state of Ohio. It was not intended to appropriate the river, nor land on the north of it. It was not practicable to do either. Then here is a plain mistake in the patent. How is it to be rectified? There must be some deviation from the calls. They cannot, therefore, define the true boundary; and, consequently, some other line than that which would be described by them must be established. This line is evidently the river. Disregard the calls for course and distance, and no rational mind can doubt that it was the intention of the government, the patentee, and the surveyor to bound the 8,200 acres on the north by the river. These calls must be disregarded, because they are incongruous and false. The river is then left without any competition with any other line, and it is established as the true line by many circumstances which could not be reconciled by fixing any other boundary."

Besides all this, it is expressly stated in the patent that the tract of land, thereby conveyed and bounded as therein set forth is located in Harlan county, Ky. Consistently with this statement, the third line of the boundary cannot be run into Virginia and Tennessee, thereby locating said tract in the three states of Virginia, Tennessee, and Kentucky. To so run it would do violence to that statement. It must be run so as to throw the whole of the tract of land in Kentucky, if any attention is paid thereto. It must be accepted, therefore, that the third line of the Ledford patent runs with the top of Cumberland Mountain, from the stake on top thereof at the end of the second line to a stake near Cumberland Gap; i. e., that this is the true meaning of the first of the three elements into which we have split the call for this line, and that the second element, to wit, that the line called for runs a course of S. 60° W., must be rejected. In rejecting it we do nothing more than we were compelled to do in regard to the call for course and distance as to the first line. It should not be overlooked,

however, that there was some basis for the course having been so given. The general course of Cumberland Mountain is southwestwardly, and according to the testimony of complainant's surveyors the course of Cumberland Mountain from the stake on top thereof at the end of the second line for a distance of one to three miles is S. 60° W. It then turns towards the north; but, as it approaches Cumberland Gap, for a distance of several miles, it resumes again the course of S. 60° W.

What, then, as to the third element of the call for the third line, to wit, that it shall go a distance of 8,320 poles, or 26 miles? Simply this, that that distance is to be applied to the top of Cumberland Mountain, and wherever it will take one there is the stake near Cumberland Gap which is called for as the end of the third line. According to complainant's surveyors, that distance lacks 724 poles of taking one to Cumberland Gap, and according to defendant's surveyor it lacks 140.59 poles of so doing. In holding that this line goes no farther than this distance will take one, I come in conflict with the opinions of Judges Barr and Evans. They held that this line ran to the center of Cumberland Gap. Complainant so contends herein. This contention, to be valid, amounts to this: That invariably, when a call says that it runs to an object near another object, you run to the latter object and not to the former. I cannot accede to the correctness of this position. There may be instances of such a call where, in order to prevent the description failing from uncertainty, it will be proper to go to the object near to which the object called for is said to be. A case of that sort exists when the object called for cannot be found and there are no data by which its place can be located. When, however, the object called for can be found or its place can be located, the line must be run to that object or place. It cannot properly be made to run to the object near to which the object called for is said to be. This distinction was brought out in the case of Harry v. Graham, 18 N. C. 76, 27 Am. Dec. 226. There the second call of the boundary involved was for a line running a certain course and distance to "a black oak near his (Graham's) own line." There was no black oak at the terminus of this line, run by the course and distance called for. It failed to reach Graham's line by 30 poles. The question was whether the line should stop at the end of the distance called for or should be continued to Graham's line. It was held that it should stop at said distance. Judge Ruffin, in delivering the opinion of the court, said:

"The call is not for that line, or for a tree in it, but to one near it. The argument is that, as it cannot be told how near, we must go to it. The argument would be strong if the call had been simply for a black oak near the line, as in the case supposed by the counsel of a description beginning at a stake or tree, not found, near the middle of the field. There would be no point but the middle of the field to govern; and, rather than the deed should be void for uncertainty, that would be adopted. But, if the words of the deed were 'beginning at a stake near the middle of the field and standing 100 poles east from a certain tree,' it would be different, because the former is removed by the mathematical certainty to be obtained by measuration from the other point given. That is precisely the case before us. The call is not merely for a black oak near the line, but that black oak is represented as standing N. 45° W. 320 poles from a chestnut and red oak, which are found, which removes the uncertainty which, without any distance given, we should feel upon the point how near the line of the other tract is to be approached."

So here the call is not to a stake near Cumberland Gap merely. It is a call for a stake near said Gap which is 8,320 poles, or 26 miles, by the top of Cumberland Mountain, from the stake on top thereof at the end of the second line. Judges Barr and Evans were led to locate the terminus of the third line of the Ledford patent in the center of the Gap by the undue emphasis, heretofore referred to, placed upon the consideration that running the third line according to the course for the distance called for would take one across the wedge-shaped point of Virginia into Tennessee, $4\frac{1}{3}$ miles southeast of Cumberland Gap. With the alternative presented of taking the end of such a line or the center of the Gap as the terminus of the third line of the patent, there was nothing to be done but accept the latter. The alternative was not presented of taking the end of the line run with the top of Cumberland Mountain, a distance of 8,320 poles from the third corner of the patent or the center of the Gap. Had it been, the result would probably have been different. This alternative, however, is presented to me, and I have no hesitancy in holding that the end of the line so run, rather than the center of the Gap, should be treated as the end of the third line or the fourth corner of the patent. No better reason for so holding can be given than that the one is called for and the other is not. This error in the holding of Judges Barr and Evans is what, in my opinion, threw Judge Hobson off the track in Creech v. Johnson. It is plain that running the third line to the center of the Gap is a strain upon the call of the patent, if not a violation of it—such a strain as was calculated to lead one to hunt up some other way of locating the patent. And this I believe to be the psychological explanation of the error into which Judge Hobson fell in locating the patent, which error I will point out further on.

If, then, I am correct so far, it must be determined which of the two measurements of the top of Cumberland Mountain from the third corner is to be accepted—that of complainant's surveyors, or that of defendant's surveyor. The experience of the former has been so much greater than that of the latter, that it must be regarded that they are beyond question the greater experts. They, no doubt, could tell the course of the top of the mountain better and measure it with greater accuracy. But defendant's surveyor is more after the order of the surveyor who made the original survey and he has furnished the number of meanders there are of the top of the mountain from the third corner to Cumberland Gap, to wit, 169, and has given the course and distance of each, so that his work can be tested. And, still further, he brings the end of the distance nearer to Cumberland Gap, and hence makes my location of the patent more in conformity with that of Judges Barr and Evans. This consideration has much force with me, as I have been bothered with the idea that perhaps comity required that I should accept their location. For these reasons provisionally I shall at least accept a point 140.59 poles from the center of Cumberland Gap as the location of the stake near that Gap called for in the third call of the patent.

We have thus far succeeded in locating the first three lines of the patent. The first line runs between two natural objects, two beeches and two sugar trees at one end and three beeches at the other. The second one runs between two natural objects, to wit, the three beeches and the top of Cumberland Mountain. The third line does not run be-

tween natural objects, but is itself in its entire course a part of a natur-al object, to wit, the top of Cumberland Mountain. In running the first line, both course and distance had to be rejected on account of the natural objects; in running the second line, the distance alone had to rejected on that account; and in running the third line, the course alone had to be rejected, and that only for that portion thereof between the two ends of the line. If, then, there is to be any difficulty in locating the patent, it must be found in the other three lines lying between the fourth and the beginning courses. There is no call for a natural object in the course of either. one of them. No natural object is struck after the fourth corner is left until the beginning corner is again reached. If running these three lines from the fourth corner according to their courses and distances would take one to the beginning corner, of course, such would be the location of them.

But it is not to be expected, in view of the departures made from the courses and distances given for the other three lines, that so running them would take one there; and it will not do so. To make the connec-tion, therefore, a departure from the course or distance, or both, of one or more of these lines will have to be made. The connection can be made by running the fourth and fifth lines according to courses and dis-tances given, and then connecting the fifth corner with the beginning by a straight line. This line will depart from both course and distance given in the patent as to it. The connection can be made by running the fourth and sixth lines according to the courses and distances given, and connecting the fifth and sixth corners by a straight line between them. To do this, the sixth line will have to be reversed, and the fifth line will depart from both course and distance given in the patent. Then the lines can be run in either one of three ways without either line departing from the course given. In each instance there will be a de-parture from distance as to one or more of the lines. The fourth line can be run according to course and distance given, and the fifth and sixth lines can be extended until they intersect. In this case the sixth line will be reversed. Then, the sixth line can be reversed, and run according to course and distance given, and the fifth line also reversed, and ex-tended on course given until it strikes the fourth line, which will short-en that line. Or the sixth and fourth lines can be extended and short-ened proportionately, and the fifth and sixth corners connected by a straight line between them according to the course given. Here, then, are five different ways of making the connection between the fourth and beginning corner. It is a problem as to which of these five ways should be adopted. Counsel on neither side have addressed themselves to this problem. The testimony of the surveyors as to the effect of these differ-ent ways of running these lines upon the location of this part of the patent has been based upon the assumption that the fourth corner is at Cumberland Gap. In solving this problem, I need the assistance of the testimony of the surveyors as to such effect on the basis that the fourth corner is 140.59 poles from Cumberland Gap, or 724 poles therefrom. There are several other suits pending in this court brought by complain-ant under this patent, and the defendants therein may be more or less affected by the location of these lines. The problem as to their loca-tion, therefore, should be set down for further hearing. According to

either way of locating said lines, a much greater part of the Cawood patent than defendants concede is within the boundary of the Ledford patent. By running the fourth line according to the course and distance given and the fifth and sixth lines as to course given, the sixth being reversed, and both extended until they intercept, the Cawood patent will be thrown entirely within the Ledford. It is not certain that it will be so thrown by running said lines in any of the other ways.

It remains to consider the location of the latter patent made by the Court of Appeals in the Creech-Johnson case. It located the first and second lines the same as I have done. It also accepted a part of the top of Cumberland Mountain as the third line. It did not, however, accept 8,320 poles of the top thereof from the third corner southwesterly as the third line. It accepted only so much thereof as lay between the third corner and the point where the top of the mountain would be struck by running backwards from the beginning corner along the sixth, fifth, and fourth lines, according to the courses and distances of the sixth and fifth lines and the courses of the fourth line. So doing shortened the fourth line from 3,200 poles to 1,090 poles, or in all 2,110 poles. It left 6,798.19 poles, instead of 8,320 poles of the top of Cumberland Mountain, between the point so struck and the third corner, as the third line, thus cutting off and throwing out of the boundary 1,521.81 poles of the top of said mountain. It is undoubtedly true that in locating a boundary it may be proper to run the lines backwards in their reverse order. The circumstances under which it is proper to do this are well stated by Mr. Justice Bradley in Ayers v. Watson, 137 U. S. 584, 11 Sup. Ct. 201, 34 L. Ed. 803, in these words:

"As already intimated, the judge was right in holding as he did and in instructing the jury that the beginning corner of a survey does not control more than any other corner actually well ascertained, and that we are not constrained to follow the calls of the grant in the order said calls stand in the field notes, but are permitted to reverse the calls and trace the lines the other way, and should do so, whenever by so doing the land embraced would most nearly harmonize all the calls and the objects of the grant. If an insurmountable difficulty is met with in running the lines in one direction, and is entirely obviated by running them in the reverse direction, and all the known calls of the survey are harmonized by the latter course, it is only a dictate of common sense to follow it."

And that case affords a good illustration of this statement. The land located in that case bounded on the north side of the San Andres river, in Texas. It was rectangular in shape, and that river was its southern boundary. The boundary called first for the western line. It ran from a pecan tree on the margin of the river N. 22° E. 22,960 varas, to a stake in the prairie. Next came the northern boundary. It ran from said stake S. 70° E. 12,580 varas, to two small hackberries. Lastly came the eastern boundary. It ran from said two small hackberries S. 20° W. 26,400 varas, to a box elder tree on the margin of said river. Now, in running these three lines in the order in which they were given, there was no difficulty with the first line. A line of the course and distance given could be run from the pecan tree, and the place where it ended could, for the time being, be accepted as the stake called for as the second corner. The difficulty came with the second line. Running it according to the course and distance given, it did not strike

any hackberries, and it fell short by 570 varas of striking the eastern line. Besides, the distance from an extension of it to the eastern line to the box elder tree was 30,400 varas, or 4,000 varas more than called for as to this line. But, by going to the box elder tree and running the eastern line backwards, the course and distance given took one along a plainly marked line with old blazes, and at the termination of the distance called for, as there was testimony tending to show, there had formerly been two small hackberries, and from that point one would be taken to the pecan tree by running the second and first lines backwards according to their courses and distances, except that the first line would be 4,000 varas shorter than called for. It was held that the boundary should be located by running the lines backwards in their reverse order, if the testimony as to the location of the hackberries was correct.

But by running the lines in their direct order in this case we meet with no difficulty, much less an insurmountable one, until after we have left the third line. It is true that the top of Cumberland Mountain, the distance called for, to wit, 8,320 poles from the third corner, does not run S. 60° W., and because it does not do so we have to reject it. But that is nothing more than we have to do with the first and second lines. We have to reject both course and distance as to the first line, and the distance alone as to the second line. The course and distance of the first line, the distance of the second line, and the course of the third line, do not harmonize with the natural objects called for, and have to be rejected for this reason, and not because they cause the slightest difficulty in locating that much of the boundary. Hence any reversing, or any effect on location due to reversing, must be confined to the fourth, fifth, and sixth lines. And in all of the five possible ways of locating those lines, save the one of running the fourth and fifth lines according to courses and distances and connecting the sixth and beginning corners by a straight line between them, involves reversing more or less as an aid in determining the location. No case can be found in which it has been held that in running the lines backwards and in their reverse orders to locate the boundary it is lawful to disregard natural objects called for in the boundary, either as corners or lines. Due respect must be shown such objects, whichever way the boundary is run, and as much one way as another.

The cases cited in the Creech-Johnson case as sanctioning the propriety of running the calls of a boundary backwards, to wit, Thornberry v. Churchill, 4 T. B. Mon. 29, 16 Am. Dec. 125, and Pearson v. Baker, 4 Dana, 321, do not lay down anything contrary to this. Yet, according to the location of the Ledford patent made in that case, 1,521.81 poles of the top of Cumberland Mountain, constituting a part of the third line, are rejected, and that line is limited to 6,798.19 poles thereof, when the patent boundary calls for 8,320 poles. That this is not proper is to be drawn inferentially from the case of Preston's Heirs v. Bowmar, 2 Bibb, 493, the decision in which the Supreme Court of the United States followed in the case of Preston v. Bowmar, 6 Wheat. 580, 5 L. Ed. 336. The boundary in that case was made up of four lines. The first line ran from an ash in the middle of a line of Glenn's land, the beginning corner, with said line, N. 20° E. 800 poles, to a hoop-

wood and sugar tree, corner to Moffit's land. The second line ran from said corner, with the line of Moffit's land, N. 70° W. 100 poles, to a sugar tree. The third line ran from the sugar tree S. 33° W. 820 poles. The fourth and last line ran thence S. 70° E. 300 poles, to the beginning. No corners were extant save the first and second, and no line was visible save that which connected these two corners and Moffit's line, which extended from the second corner and a part of which was the second line. The sugar tree called for as the third corner was not extant or located. So the call for the second line was the same as if it did not call for a sugar tree, but was simply for N. 70° W., with Moffit's line, 100 poles, from the second corner. In running the third and fourth lines from the end of said 100 poles to the beginning corner according to the courses and distances given the boundary would not close. To close it resort was had to reversing it. It could be closed by running the third line direct and the fourth line reversed, according to the courses given, and extending them until they intersected. This would require an extension of the fourth line 81¼ poles. It could be closed by running the fourth line reversed the course and distance called for, and connecting the termination thereof with the termination of the 100 poles of Moffit's line constituting the second line. It was held that the last way was the proper one to close the boundary. The matter is reasoned out by Judge Boyle with his usual force. One reason given is that according to either way there was a surplus of acreage, and according to the way adopted the surplus was less, though even then it was more than 200 acres. The idea never occurred to Judge Boyle, or, if it did, it was not expressed, that the survey could be closed by not only reversing the fourth line and running it according to course and distance given, but also reversing the third line and running the course given until it struck Moffit's line, thereby cutting off and throwing out of the boundary 81¼ poles of the 100 poles of Moffit's line called for as the second line.

In this case I do not think it is possible to give any good reason for rejecting 1,521.81 poles, or nearly 5 miles, of the top of Cumberland Mountain, called for as the third line of the patent. Three reasons are given for so doing in the Creech-Johnson case. One is that if the patent is located by running the fourth line from the stake near Cumberland Gap, treated as in the center thereof, the course and distance given, and the fifth and sixth lines the courses given, the sixth line being reversed, and both lines extended until they intersect, the fifth line will be 2,058 poles longer than called for and the sixth line 1,840 poles. How much longer they will be than called for if the stake near Cumberland Gap is located 724 poles, or 140.59 poles, from the Gap, does not appear. Certainly not as much longer as where the stake is located in the Gap; but still, no doubt, they will be much longer. But that is only one of five possible ways of locating these three lines of the patent, and the most advantageous to complainant.

Then, again, it is urged that if the patent is located in this way it will contain an acreage considerably in excess of that called for in the patent. The patent calls for 86,000 acres. According to the testimony of defendant's surveyor, who testified in that case, the quantity in it so located will be 182,184 acres; whereas, locating it as located in that

case, it will contain 93,552 acres. But according to the testimony of complainant's surveyors herein there is within the boundary, locating it according to the way stated, 105,000 acres covered by senior patents, which deducted from 190,000, the quantity in the boundary as they estimated, leaves 85,000 acres. It is true that literally the words of the patent make 86,000 acres the quantity within the boundary, and not the quantity within it not included in senior patents. But the words used are not inconsistent with the intention that it should refer to the latter. And the persons claiming the patent have always assessed 86,000 acres for taxation and paid taxes on that quantity. But, apart from all this, the excess in quantity cannot control the location of the first three lines. They are unalterably fixed by natural objects. The sole place in which the excess in quantity can have a bearing in locating the patent is in the other three lines, the fourth, fifth, and sixth. Just what bearing they shall have there I will not undertake to say now. I have left open for further determination the location of those lines. It is not amiss, however, to direct attention to one point in the case of Ayers v. Watson, referred to above on the first hearing in the Supreme Court. It may be found in 113 U. S. 594, 5 Sup. Ct. 641, 28 L. Ed. 1093. The grant involved therein, termed the "Moreno grant," called for just 11 leagues of land. As before stated, the third or northeast corner was two small hackberries. They were not to be found at the time of the litigation, and it was a question of fact for the jury as to where they were located. Evidence introduced by the party contending for the narrower location of the grant tended to locate them at the end of the blazed eastern line from the box elder tree or fourth corner, the termination of the distance given for that line. Evidence introduced by the party contending for the wider location of the grant tended to show that they were not so located. It was, therefore, a question also for the jury to determine how the grant should be located on the basis they found that the hackberries were not so located. In view of this, the trial court instructed the jury as follows:

"If you are not able to fix the disputed lines, or the disputed portions of the lines, with reasonable certainty, from the proof, you may, taking the river as a basis, so extend the eastern and western lines as that a line run N. 70° W. (or S. 70° E.), connecting the extremities of said side lines, will embrace 11 leagues of land."

In other words, the jury was told that, in the contingency stated, they were to be governed in locating the northern line by the quantity called for in the grant. This was held to be an error. Mr. Justice Bradley said:

"The statement in the first part of the charge, that the jury should follow in the tracks of the surveyor, so far as they could be discovered, and when these were not to be found they should follow the course and distance which he gives, so far as not in conflict with tracks that are found, was correct. Had this proposition been followed in the subsequent part of the charge, it would not have been open to criticism. But when directions were given to the jury in greater detail, they were not referred to the courses and distances given by the surveyor, in case they were unable to identify his tracks (that is, in case the proof relating to the two hackberries was insufficient) ; but they were told thus, 'You will from the whole proof so fix the unmarked or disputed lines called for in the grant as in your judgment most nearly harmonizes the calls with the known corners and the undisputed lines,' and,

if not able to fix these lines in this way, then to resort to the rule of quantity. This was putting the matter as if it depended on the judgment of the jury whether the lines could be run according to the survey; whereas, if not compelled by fixed monuments (such as the plaintiff claimed the hackberry trees to be) to run the second or back line in a particular manner, there was nothing in the way, so far as the evidence showed, of running the first and second lines according to the field notes, only extending the second line so as to meet the east line, the position of which was known. If the northeast corner was not determined by the hackberries, there was nothing to interfere with the location of the Moreno grant in exact accordance with the field notes, except the one thing of extending the second line far enough to meet the conceded location of the eastern boundary. It did not depend on anything requiring the exercise of judgment on their part. It was a matter of course. If the position of the eastern line had not been discovered at all, and nothing had been known but the beginning corner, the field notes would have furnished the only guide for locating the survey. The position of that line being known, it controlled the survey only in respect to that line, which required the second line to be extended sufficiently to reach it. But, if the two hackberry trees in that line were also identified as the true northeast corner, then the position of the north line and the length of the first course would be controlled by those trees. We think there was an error in not putting it to the jury with sufficient distinctness that the course and distance of the first two lines of the survey must govern, if the evidence was not sufficient to fix the location of the northern line by identifying the two hackberries with those called for in the field notes for the northeast corner of the survey, or by some other marks or monuments."

According to this, the quantity called for not only had no bearing in locating the grant by the natural objects called for, but also it had no bearing in locating it by the courses and distances called for. It was held that, if it could not be located according to natural objects, it should be located according to the courses and distances, without reference to the question of quantity. In that case there was but one way of locating the grant by courses and distances. Here there are five alternative ways of locating the fourth, fifth, and sixth lines, and it may well be that in this case the matter of quantity should cut a figure in determining which of these ways shall be adopted, just as in the case of Preston v. Bowmar, supra, the question of quantity was considered by Judge Boyle in determining which of the two alternative ways of locating the third and fourth lines should be adopted. In no other way can the matter of quantity have any determining force in locating the Ledford patent. As said by Judge Guffy in Pitman v. Nunnelly, 17 Ky. Law Rep. 793, 32 S. W. 606:

"The commonwealth has conveyed that boundary to him and the quantity embraced cannot change the law. This doctrine has been so often announced by this court that citation of authorities is unnecessary."

Then again the Court of Appeals directs attention to the fact that, if the Ledford patent is located in the way it declined to locate it, it will include within its boundaries Harlantown, the county seat of Harlan county, held under senior patents; whereas, if located in the way in which it decided it should be located, that place would be excluded from it. This is no doubt true, and the probability is that the boundary will include said place if the fourth, fifth, and sixth lines are located in either one of the five alternative ways in which they may be located. But there is no greater reason for locating the patent so as to exclude Harlantown than for locating it so as to exclude any other sen-

ior patents of which, as heretofore stated, there are a great number, and that, whichever way of the five you locate it. Why, then, should the location of any of these senior grants have anything to do with the location of the Ledford patent? What right is there to so locate it as to exclude one senior patent rather than another? As a matter of fact, at the time of the making of the survey, and issuance of the patent, there were not more than three or four people living in Harlantown. Further, it is conceded that the Cawood patent includes said towns within its boundaries, and also that it contains 18,477 acres, when it calls only for 9,500 acres. These, then, are my reasons for differing from the position of the Court of Appeals in the Creech-Johnson case. I hope no one will think that I have not due respect for that court, and would much prefer to agree with it than to differ. I only differ from it because my convictions compel me to do so, just as they compel me to differ from Judges Barr and Evans in the particular above stated. I have set forth in detail my reasons for so differing, so that it can be judged whether I am right or wrong. If I am wrong, I feel that what I have said will find justification in that it may be of some help, at least, in reaching a correct conclusion.

The consideration of the question as to the true location of the Ledford patent thus far has left open for determination the exact location of the stake on the top of Cumberland Mountain near Cumberland Gap constituting the fourth corner of the patent, and which of the five possible ways of locating the fourth, fifth, and sixth lines of the patent should be adopted. Leaving them so for the present, I pass to the other questions requiring determination at my hands.

Defendant contends that the bill should be dismissed, because complainant has failed to show that the land claimed by him and as to which he seeks to have his title quieted is claimed by defendant, or, in other words, that any part of the Cawood patent under which defendant claims is outside of those portions of the Ledford patent covered by said senior patents and prior conveyances which were excepted from the deed by the Ledford patentees to Edward M. Davis, and hence within that portion thereof which passed by said deed, the only portion thereof to which complainant claims title. It is well settled that one claiming under a deed which excepts certain portions of a tract of land therein described and conveys the remainder thereof only must show that the land claimed by him is outside the exception in order to show that he acquired title thereto by virtue of said deed. This was decided in the following cases, to wit: Guthrie v. Lewis' Devisees, 1 T. B. Mon. 142; Hall v. Martin, 89 Ky. 9, 11 S. W 953; Moses v. Gatliff, 12 S. W. 139, 11 Ky. Law Rep. 356; Hawkins v. Barney, 5 Pet. 457, 8 L. Ed. 190; Greenleaf v. Birth, 6 Pet. 303, 8 L. Ed. 406; Maxwell Land Grant Co. v. Dawson, 151 U. S. 603, 14 Sup. Ct. 458, 38 L. Ed. 279; Webb v. Phillips, 80 Fed. 954, 26 C. C. A. 272. These were all actions of ejectment, save the last, and that was an action to recover possession of logs, the title to which depended on the title to the land from which they were cut. The rule applies equally well, I think, to a suit in equity to quiet title. To be entitled to such relief, the complainant should show that the defendant is claiming the land to which he claims title, and,

if he is claiming under such a deed, he cannot show this without showing that the land claimed by defendant is outside the exceptions.

How, then, as to defendant's contention? That the Cawood patent is wholly outside of the exceptions, so far as they relate to prior conveyances, is shown by the exceptions themselves, which to this extent are specifically identified in the deed, and defendant does not contend otherwise. Then, as to the exceptions so far as they relate to the senior patents: The defendant does not deny that some part of the Cawood patent is not within that part of the Ledford patent outside the senior patents. He says in his answer that he has not sufficient knowledge or information to form a belief in regard thereto, but limits his denial to a denial that exceeding 1,000 acres of the Cawood patent is within such part of the Ledford patent. Possibly this does not relieve complainant of the necessity of proving that some part of the one patent is within that part of the other patent. Treating the matter so, it must be conceded that, so far as the evidence introduced by complainant is concerned, it is not shown that such is the case. But I think there is evidence introduced by defendant that tends to show it, if the Cawood patent is entirely within the Ledford, which provisionally must be accepted to be the fact. In that contingency, defendant's claim is based on the fact that some part of the Cawood patent is within such portion of the Ledford patent. He does not claim title in his son to the whole of the Cawood patent. It is true that in some parts of his pleading, in setting forth his claim, it is put forward as embracing the entire patent; that the title deeds under which the claim is asserted back of the judicial proceedings under which his son acquired title cover the whole patent; and that Judge Hall, who acted as agent for a predecessor in the title from 1887 to 1898, testifies in certain portions of his deposition that his claim on behalf of his principal was to the bounds of the Cawood patent. But it is evident that defendant recognizes that there are patents senior to the Cawood patent, as to which that patent is invalid, and that he only claims so much of the Cawood patent as is outside of said senior patents. In his original answer he expressly states that his claim is to the Cawood patent—

"Except so far as the land within said outer boundary is embraced within the boundaries of patents older than either the patent for 9,500-acre tract of land mentioned in the bill of complaint or the patent for said 86,000-acre tract of land mentioned in the bill of complaint."

Then on cross-examination Judge Hall, who made the judicial sale in which defendant's son purchased as commissioner of the Jefferson circuit court, testified that the sale bill described the land to be sold as lying and being on the waters of Clover Fork and Poor Fork and Big Black Mountain, patented in a 9,500-acre survey and containing 5,000 acres, more or less, which as he testified was the quantity then supposed to be within the Cawood patent after deducting the portions thereof covered by the senior patents. Treating this claim literally, there was no claim at the judicial sale to any part of the Cawood patent covered by the Ledford patent, for the latter was a senior patent to the former— three days the senior. It is certainly a claim to no part of the Cawood patent senior to it and the Ledford patent both, the way the claim is put in the original answer. But what is senior to the Ledford patent is

also senior to the Cawood patent. If, then, the Cawood patent is entirely within the Ledford patent, the defendant has no claim whatever, unless some, part of the Cawood patent is in that part of the Ledford patent outside of the patents senior to it. Hence it is I have said that in that contingency defendant's claim is based on the fact that some part of the Cawood patent is within that part of the Ledford patent outside of the patents senior to it. Unless such is the case, the defendant has no claim to a foot of land. And in that contingency defendant's evidence may be treated as tending to show that as much as 5,000 acres of the Cawood patent is within that part of the Ledford patent outside of the patents as complainant claims. The statement in said sale bill tends to show that Judge Hall on direct examination testified in regard to 29 patents senior to the Ledford patent, copies of which he files with his deposition, covering about 4,500 acres of land, which he says he knows are within the Cawood patent, and refers to 40 or 50 other such senior patents as to which he has heard were within it, and on cross-examination he testified that there are "some less than 5,000 acres" in the Cawood patent outside said senior patents as to which he thus testified on direct examination. In the contingency that the Cawood patent is not wholly within the Ledford patent, it is possible that the senior patents may cover that part of the Cawood patent within the Ledford patent, and that part of the Cawood patent not covered by senior patents may be wholly outside of the Ledford patent. In this contingency, of course, no part of defendant's claim will be within the land to which complainant claims title, and complainant will be entitled to no relief as against defendant. This, perhaps, is hardly more than a mere possibility. But, until the Ledford patent is fully located in the particulars left open, it cannot be told that it may not be so located as to embrace the entire Cawood patent, in which event, according to defendant's claim and the testimony of Judge Hall, as much as 5,000 acres of land claimed by defendant is within the land claimed by complainant, to which he has shown paper title.

In any event, then, the disposition of this contention of defendant should be postponed until the final determination of the question as to the location of the Ledford patent. However, complainant could not have shown how much, if any, of the claim of defendant was within that part of the Ledford patent outside of the senior patents and its exact location without causing said patents to be located, and this could not be done without a survey. The evidence establishes that, owing to the opposition on the part of the people living in that part of the Ledford patent covered by the Cawood patent to the making of a survey, to the end of locating said senior patents, it could not have been had without its being done under the order of the court. Had the complainant in advance of the hearing of this cause applied for an order of survey, it would have been denied until at least the contention of defendant that this court was bound by the location of the Ledford patent in the Creech-Johnson case had been disposed of. Otherwise much useless labor and expense might have been incurred. In view of this consideration, if defendant were otherwise entitled to have the bill dismissed on the ground claimed, I would refuse to dismiss it. I leave open, then, for further determination what, if any, action should be had looking to the location of said senior patents.

Again, defendant contends that the bill should be dismissed because it is shown by the evidence that complainant's right to the land in contest had been barred by 15 years' adverse possession by his son and those under whom he claims immediately preceding the bringing of this suit. The burden was upon the defendant to make this good. In order for this position to be well taken, three things are essential: There must have been an actual possession of the land in contest; that possession must have been continued without break for a period of 15 years; and there must have been a claim of ownership of the land. There is ground for saying that, prior to the bringing of this suit, there was claim of ownership to the land in contest, and that for a period of 15 years. But this is at least questionable, in view of the testimony of Judge Hall that at the judicial sale, at which defendant's son purchased, the land proposed to be sold was advertised as the land within the Cawood patent not covered by senior patents, estimated as 5,000 acres. This aside, however, is there evidence of any actual possession of the land in contest—much less of 15 years' adverse possession on the part of those under whom defendant claims? In disposing of this question, I will treat the matter as if there had never been any actual possession in complainant and those under whom he claims of any part of the land conveyed by the deed to Edward M. Davis, which is the most favorable view of it for defendant. In order that there may have been actual possession of the land in contest in those under whom defendant claims, it is necessary that there should have been an intrusion on said land, either by residence, inclosure, or other act of equal notoriety.

The only such act on which defendant relies is the Little settlement on Fouch's Branch of Clover Fork. The evidence makes clear that this is an old settlement. But it also makes clear to my mind that this settlement is within the senior patent for 5,000 acres issued to Jacob Myers May 6, 1788, on a survey dated April 19, 1786, and the senior patent, No. 2,196, for 1,600 acres issued to Aaron Fountain July 31, 1801, on a survey dated November 6, 1796. Mr. Duffield, one of complainant's surveyors, testifies distinctly that it is within both patents, and demonstrates that it is. So far as said Aaron Fountain patent is concerned, he was unable to locate it by first locating the other two Aaron Fountain patents, both issued the same day as the other, to wit, July 31, 1801—one, No. 2,197, on a survey dated November 2, 1796, for 1,600 acres; and the other, No. 2,198, on a survey dated November 8, 1796, for 1,800 acres. These two patents he was enabled to locate by having their beginning corners pointed out to him by competent persons. These corners were tree corners and are well known—that of 2,197 said to be 80 poles above the South (Martin's) Fork of Cumberland river, and that of 2,198 said to be 80 poles above the mouth of the North (Poor) Fork of said river. The one corner is said to be on the "most northwardly" bank of said South (Martin's) Fork, and the other on the "most eastwardly" bank of the North (Poor) Fork. It seems to me there is a mistake here. The calls should have been just the reverse. The corners are so located according to the testimony. No. 2,196 calls for the second corner of 2,197, and its lines are called for by No. 2,198. It thus lies between the two on the Middle (Clover) Fork of said river, into which Fouch's Branch, on the east side of which is the Little settle-

ment, empties from its north side. Mr. Duffield ascertained by actual survey the relation of this settlement to the beginning corners of said two Fountain surveys, as well as the relation to each other of the various features of the topography of the entire country in that quarter. By protraction, therefore, of these three Fountain surveys, he was enabled to say whether the Little settlement was within the Fountain patent No. 2,196. I do not think Mr. Kirby had sufficient information to say whether it was within said patent.

It is equally clear that it is within the Jacob Myers 5,000-acre patent. That patent is said to be at the three forks of Cumberland river on the upper side. It calls for a 1,000-acre patent issued same day on a survey made four days before it was made, to wit, April 15, 1788. That 1,000 acres lies in a square. Each side of the square is 400 poles long. The beginning corner is a black oak on the north side of the North (Poor) Fork of Cumberland river, and its first line runs from that corner S. 20° E. 400 poles, "crossing three forks." The land covered by the patent lies west of that line. The 5,000-acre patent is a trapezoid; the two nonparallel lines striking the parallel lines at equal angles. Said eastern line of the 1,000-acre patent is the middle part of the shortest of the two parallel lines of the 5,000-acre patent, which extends 100 poles on either side of said eastern line, and is hence 600 poles long. This line of the 5,000-acre patent is its western line, and it lies on the east thereof. If, then, the eastern side of the 1,000-acre patent can be located, the 5,000-acre patent can be located from it by protraction. These two Myers patents were issued on surveys made about 10 years earlier than those on which the three Fountain patents were issued. No. 2,198 Fountain patent calls for Jacob Myers' lines. Nothing else appearing, this must mean the lines of one or the other or both of said earlier Jacob Myers patent; their other lines showing that they lie in the same neighborhood. It begins where "Jacob Myers' line should cross" the North (Poor) Fork of Cumberland river, and runs thence in a westerly direction with Myers' line. Locating the beginning corner of the Myers 1,000 acres at the beginning corner of the Fountain 1,800-acre patent, No. 2,198, will so locate the former patent as to substantially harmonize the latter patent with it; that is, a point where Jacob Myers' line should cross said fork, to wit, the western line of the 5,000-acre patent and the eastern line of the 1,000-acre patent, and a line of said Myers run in a westerly direction therefrom, to wit, the last or northern line of the Myers 1,000-acre patent. There is a difference, however, of 6 degrees in the two calls, and the Fountain patent does not call for the same timber as the two Myers patents call for at that point. The one difference can be accounted for by mistake, and the other by design. If the beginning corner of the Fountain patent No. 2,198 be accepted as the beginning corner of the Myers patents, then the Myers 5,000-acre patent located by protraction therefrom will include the Little settlement. If, however, this is not accepted, the only other possible way of locating the eastern line of the Myers 1,000-acre patent is by moving it either west or east, but not moving it so far in either direction that it will not cross the three forks of Cumberland river; for it is so located in said patent. The farther east this line is moved, the farther inside of the Myers 5,000-acre patent

141 F.—47

will the Little settlement be thrown, and it cannot be moved far enough west to exclude it.

I, therefore, conclude that the Little settlement is within patents senior to the Ledford patent, and hence not in that part of said patent not covered by senior patents to which complainant claims title. It was not, therefore, an intrusion on complainant's title. Not only is it within patents senior to the Ledford and Cawood patents, but the evidence justifies the conclusion that it was never claimed under the Cawood patent. Mr. Little testifies that from 1848 William Turner had tenants on it and claimed it. This was before he acquired title under the Cawood patent, which was in 1854. It was not sold as a part of the Cawood patent in 1887, when in the settlement of William Turner's estate the patent was sold and purchased by the Commonwealth Land & Lumber Company. It had theretofore been conveyed by William Turner to his son, George B. Turner, who on September 14, 1884, conveyed it to W. C. L. Huff. And in the spring of 1887 it was conveyed by him to said company. Mr. Huff testifies that this land was sold and conveyed to him as a part of, or along with, what was known as the "Hensley Place," which William Turner held under the Fountain patent. And though, in a written statement given by George B. Turner at the time of Huff's purchase, it is stated that it was held under the 9,500-acre patent, Mr. Turner testified on cross-examination that it was his understanding that it was in the Aaron Fountain patent, and that his father had told him that he thought it was in it, and that he had purchased 200 acres of the Fountain patent. There is a failure, therefore, on defendant's part, to prove 15 years' adverse possession of the land in contest. The fact is that a careful consideration of the evidence induces the conviction that, notwithstanding the Cawood patent was conveyed as a whole by the mesne conveyances under which defendant claims without mention of senior patents, there was no claim really to any portion thereof, except so far as it lay outside senior patents. And though it may not have been known that the Ledford patent covered much, if any, of the Cawood patent, this fact did not make the claim, if so limited, adverse to the Ledford patent.

Finally, defendant contends that the bill should be dismissed because there is no proof of actual possession on part of complainant at the time this suit was brought. Undoubtedly actual possession is essential to enable one to maintain a suit to quiet the title to land. Peck v. Ayers & Lord Tie Co., 116 Fed. 273, 53 C. C. A. 551. And though the cases before Judges Barr and Evans in relation to this same tract of land were suits to quiet the title in which actual possession to their maintenance was necessary and actual possession was found and adjudged therein, and though the defendant in his original answer admits the possibility that complainant or those under whom he claims may at some time have been in possession of some part of the land claimed by him, which would be sufficient to give possession of the whole, except so far as adversely held, it is probable that it was essential for complainant to prove herein actual possession of the land in contest at the time this suit was brought. I will so treat it. I think the complainant has proven such possession. The testimony shows that on September 21, 1892, the then holder of the title under which complainant claims leased to J. H. Mid-

dleton the entire land claimed by him, and under that lease said Middleton a year or two thereafter cleared, inclosed, and began to cultivate over 10 acres of said land on the east side of Turner's Branch, which empties into Clover Fork from the north side, and has had possession of it ever since, and that later under said lease he took possession of certain land on the left-hand fork of Ages Creek, which empties into Clover Fork from the north side, both of which parcels are within the Ledford and Cawood patents and outside senior patents, and that on October 3, 1898, the then holder of the title under which complainant claims made a similar lease to said Middleton and one Hiram Cawood, and under that lease shortly afterwards they entered and cleared and inclosed and placed tenants on about 15 acres on the east side of Mill Branch, which empties into Clover Fork from the south side, and have had possession thereof ever since, which land is inside both the Ledford and Cawood patents and outside senior patents.

Point is made of the fact that according to Mr. Middleton's testimony the 10 acres on Turner's Branch is surrounded entirely by older titles and possession, and it is claimed that this fact prevented said act of taking possession extending farther than the 10 acres. Granting for the sake of the argument, that this is so; it amounted to a taking of possession of that much of the Ledford patent, and this possession was sufficient to uphold a suit to quiet the title as to said ten acres. In view of this, I think that the court of equity, to prevent a multiplicity of suits, would quiet the title to the rest of the Ledford patent, held under the same claim, even though there may have been no actual possession thereof. But I think that the several acts of possession taken under said leases were sufficient to give actual possession of the entire boundary, so far as not adversely held.

I will set the case for further hearing at Frankfort on the first day of the next September term as to matters left open herein, and it will be well if counsel for all persons concerned in the litigation pending in this court in which the location of the Ledford patent is involved could be present and indicate such views as they have in regard to the matter.