## TAYLOR & CRATE v. BREATHITT COAL, IRON & LUMBER CO. et al.

(Circuit Court, E. D. Kentucky. February 14, 1911.)

1. BOUNDARIES (§ 33*)—PATENTS OF KENTUCKY STATE LANDS—EVIDENCE TO IDENTIFY LAND — EXCLUSION OF PRIOR GRANTS WITHIN BOUNDARY DESCRIBED.

A party to a suit to establish title to land who claims under a state patent for a large tract, which states that it contains a certain number of acres, but excludes a certain number of acres within its boundaries as having been previously patented or appropriated, has the burden of proving that the land in dispute is within his own boundaries and with-

out those of prior grants, but he is not required to make such proof beyond a reasonable doubt, and it is sufficient if the evidence reasonably establishes such facts.

[Ed. Note.—For other cases, see Boundaries, Cent. Dig. §§ 146–152; Dec. Dig. § 33.*]

2. ADVERSE POSSESSION (§ 100*)—EXTENT OF POSSESSION—TRACTS HELD BY DIFFERENT TITLES.

Under the law of Kentucky, entry and inclosures made entirely upon land to which the person entering had title and right of possession under a grant from the state cannot extend his possession to other land outside of his grant, but covered by a grant to another, which can ripen into title thereto by adverse possession against the legal owner, although it was his intention that his possession should cover the latter also; the law being that the owner cannot be divested of his title by adverse possession when there has been no entry anywhere on his land.

[Ed. Note.—For other cases, see Adverse Possession, Cent. Dig. §§ 547–574; Dec. Dig. § 100.*]

3. ADVERSE POSSESSION (§ 43*)—CONTINUITY OF POSSESSION.

Where possession was taken of a large tract of land, to a part of which the occupant had title under a patent and to a part of which he did not, the continuity of the adverse possession of the latter was broken by his sale of the patented land only and his removal from the tract, and where his grantee claimed only the land conveyed, and it cannot be tacked to a possession subsequently retaken by him.

[Ed. Note.—For other cases, see Adverse Possession, Cent. Dig. §§ 213–225; Dec. Dig. § 43.*]

4. BOUNDARIES (§ 37*)—LANDS PATENTED BY STATE—LOCATION OF GRANT.

Evidence considered as to the location of a 10,000-acre survey of land in Kentucky for which a patent was granted by the state of Virginia in 1789.

[Ed. Note.—For other cases, see Boundaries, Cent. Dig. §§ 184–194; Dec. Dig. § 37.*]

5. ADVERSE POSSESSION (§ 100*)—EXTENT OF POSSESSION.

Where one took possession of land claiming under a patent which was void because the land was a part of a larger tract covered by a prior patent, so that his possession was altogether wrongful and adverse to the true owner, his possession was not necessarily limited to the part in fact covered by the patent under which he claimed, but he may acquire title by adverse possession to so much of the larger tract as he actually claimed.

[Ed. Note.—For other cases, see Adverse Possession, Cent. Dig. §§ 547–574; Dec. Dig. § 100.*]

6. ADVERSE POSSESSION (§ 7*) — PUBLIC LANDS OF STATE — GRANT TO THIRD PERSON.

The possession of land belonging to the state by one claiming title thereto, although without right, on the patenting of such land by the state to another, at once becomes adverse to the patent. and ripens into a title if continued for the statutory period after the issuance of the patent.

[Ed. Note.—For other cases, see Adverse Possession, Cent. Dig. §§ 24–42; Dec. Dig. § 7.*]

In Equity. Suit by Taylor & Crate against the Breathitt Coal, Iron & Lumber Company, F. W. Fletcher, Samuel M. Noble, and Demosthenes Noble. Final decree.

W. B. Dixon, Pollard & Redwine, A. P. Humphrey, and Edward R. Bosley, for plaintiff.

J. J. C. Bach, S. D. Rouse, and Hazelrigg, Chenault & Hazelrigg, for defendants.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

COCHRAN, District Judge. This cause is under submission for final decree. I had intended to write a more elaborate opinion in this case than I now purpose to do, though it is apt to be quite elaborate as it is. The particulars, which I had intended to elaborate, but will not, concern the question of possession of the land in contest. This involved a visualization of the land itself, a presentation of the whole law of Kentucky as to possession, covering all the earlier decisions of the Kentucky Court of Appeals which gave it form, and a statement of the true history of what had been done in relation to that land and adjacent parcels from the time of Lewis Campbell down, covering all the details. I have found that it is' not essential that I do this in order to make clear the grounds upon which I purpose to decide the case, and I have already kept it so long and other work is so pressing that I would not be justified in taking the time to deal with these matters in as full a way as I would like to do. I feel that I have gone to the bottom of the case and considered all suggestions that have been made in regard to it. I know that I now have a conviction as to how it should be decided, and I will say only so much as is necessary to indicate why I have felt driven to that conviction. In so doing I will lay down a series of propositions and endeavor to make each one good.

First, I think it must be accepted that the Reid patent covers all the land in contest, provided the Ross & Currie patent does not cover any portion of it. Of course, if the Ross & Currie patent covers any portion of it, the Reid patent does not cover such portion, because the Reid patent expressly excepted from it all land previously patented or otherwise appropriated, and the Ross & Currie patent is a much older patent than the Reid. It follows from this that the corporate defendant is entitled at least to as much of the land in contest as is not covered by the Ross & Currie patent, unless it has been shown that its title thereto has been divested by 15 years adverse possession on the part of the plaintiff and those under whom it claims. All I say under this head is on the basis that the Ross & Currie patent is out of the case. Plaintiff's counsel argues earnestly and ably that it has not been shown by defendants that the Reid patent covers any portion of the land in contest, and as the position that it does hurts plaintiff, should I conclude that it has not established 15 years adverse possession, I cannot content myself with laying down this proposition, but must make it good.

Counsel's point here is this: The Reid patent grants a certain boundary of land containing 154,800 acres, but excepts therefrom as having been previously granted and otherwise appropriated 25,800 acres of land, leaving 129,000 acres conveyed. Had the patent simply granted the land within the exterior boundary without any exception, though it would not have been good as to the previously patented and otherwise appropriated land, the defendants would not have had to do more than show that the land in contest was within such exterior boundary in order to establish the corporate defendant's right thereto, nothing else appearing. But, as the patent expressly excepts previously patented and otherwise appropriated land, they could not show that the land in contest was covered by the patent simply by showing that it

was within the exterior boundary thereof. They had to go further, and show that it was not within the previously patented and otherwise appropriated land. In other words, to show that the land in contest was covered by the Reid patent, they had to show that it was within the exterior boundary thereof and without its exclusions. And the claim is that, though the defendants have proven that the land in contest is within the one, they have not proven that it is without the other. It is on this ground that it is argued that it has not been shown that the Reid patent covers the land in contest. But, though the burden was on the defendants to make out that the land in contest is without the exclusions of the Reid patent—i. e., land previously patented or otherwise appropriated—they were not bound to prove this fact beyond a reasonable doubt. It is sufficient, at least, if they have made it out with reasonable certainty. Defendants' case here mainly consists of the testimony of the corporate defendant's surveyor, Gibson. He spent 12 days in the land office at Frankfort examining the records to find out what previous patents and surveys might possibly cover the land in contest. He had also examined the surveyor's records of Breathitt county, though not as thoroughly as he did those in the Frankfort office. Besides this, he spent five years on the land ascertaining its character, and locating the corporate defendant's patent. He had turned up between 400 and 500 patents covering land within the exterior boundary of that patent, many of which he had located and as to all of which he had a general idea as to their location. Of this 400 or 500 he located 24 adjacent to and binding on the land in contest, and he has filed a map showing the location of 20 of the 24. With this extensive knowledge on the subject, he has testified that no portion of the land in contest is covered by any previously patented or appropriated land. He is quite severely criticised, but I see no good reason for not accepting that statement as sound. In this particular, at least, it has not been shown that his testimony is incorrect. No previous patent or survey has been introduced showing that it covers any part of the land in contest. The most that is claimed is that it is possible that there may be a previous patent or survey covering some portion or all of the land in contest which he has overlooked by not making his examination of the records in the land office at Frankfort and in the surveyor's office of Breathitt county as thorough as it might have been and of his not having examined at all the records in the surveyor's offices of the counties out of which Breathitt county and its predecessors have been carved. It should be conceded that there is a possibility of this being so. It is possible that there is one or more big patents calling for the waters of Licking river and of Kentucky river which when run out may take in the land in contest. It is possible that one or more of the five Ross & Currie patents which plaintiff claims are located on Troublesome reach over to the land in contest, and so as to patents on Quicksand, Troublesome, and Buckhorn which Gibson has or may have overlooked. It is possible that there is some old survey over 40 or perhaps 100 years old not yet carried into a patent which covers the land in contest. But it is not at all likely that either one of these things is so. As to such old surveys, it cannot be said that it is

more than a bare possibility that there is one which has been allowed to remain uncarried into a patent for so long a period of time. As to the patents on Quicksand, Troublesome, and Buckhorn which it is claimed Gibson overlooked, it is not claimed that either one of them covers any part of the land in contest. Nor is it claimed that either of the five Ross & Currie patents referred to do so. Major Wright does not know where they are located other than that he thinks that they are located on Troublesome. Then as to big patents calling for Licking and Kentucky rivers which may take in the land in contest, it is not likely that Gibson could have been on the ground doing the amount of surveying and investigating he has been engaged in without hearing of it or in some way running across it.

A strong corroboration of Gibson's testimony exists in the fact that Major Wright had been for two years on the ground, surveying for plaintiff and looking after its interests, before he testified and made his map, and he knows of no patent or other appropriation previous to the Reid patent. His map gives the state of his knowledge, and it agrees substantially with that of Gibson. The preparation of this case indicates that plaintiff has itself investigated all previous patents or other appropriations that might possibly cover the land in contest, and it has found none. Besides this, numerous witnesses have testified whose recollection go back before the war, and none of them ever heard of any patent or survey covering that land. They all seemed to be more or less familiar with the patents which the two surveyors have placed on their maps as lying adjoining the land in contest, and it does not appear that they knew of any others that might cover any portion of the land in contest. I think, therefore, that this entire record makes it appear with reasonable certainty that the land in contest is without the exclusions, and hence is covered by the Reid patent. I can almost say that I believe this beyond a reasonable doubt. Where, then, did such a conviction get into my head if it did not get there from the record before me?

In the case of Crate v. Strong (Ky.) 69 S. W. 957, the plaintiff here convinced the Court of Appeals that the Reid patent covered so much of the land in contest at least as was covered by the Strong patents. And in the case of Bowling v. Breathitt Coal, Iron & Lumber Company, 134 Ky. 249, 120 S. W. 317, the corporate defendant convinced the same court that the 100 acres involved in that case was outside of the exclusions, and hence covered by the patent. I am quite satisfied that the plaintiff in the one case and the corporate defendant in the other came very short of measuring up to what it is claimed the defendants should have done here in making out that the land in contest therein (that in the first case being a part of that in contest here) was covered by the Reid patent. Indeed, I have no doubt that the defendants here have taken much greater pains than was taken to this end in either one of those two cases. Besides all this, in the case of Steele v. Bryant, 132 Ky. 569, 116 S. W. 755, where the exterior boundary covered 140,000 acres and the exclusions 120,000 acres, leaving only 20,000 acres covered by the patent, here is what the Court of Appeals of Kentucky held to be sufficient evidence to take the case to the jury

as to whether the land in contest was without the exclusions. Judge Hobson said:

"It is insisted that the evidence offered by the plaintiffs on the trial is not sufficient to show that the land recovered is outside of the exclusions referred to in the different patents under which the plaintiffs claim. The plaintiffs introduced two surveyors on the trial who had spent a large amount of time and labor in locating these old surveys. The rule in this state is that, if there is any evidence, the question is for the jury, and under this rule we think there was sufficient evidence to submit the question to the jury. L. E. Bryant, one of the surveyors, testified that he had gone to the land office, and had obtained there a complete list of all the land grants within the boundary of the larger patent which included all the others. He said that there were about 400 of these surveys, and about one-third of them lay in Laurel county. He had located a large number of them; and, while he had not located all of them, he testified substantially that those he had not located did not include the land in controversy, or were not near it. While a surveyor might not know the precise location of a patent which he had not run out, when he was familiar with the country, he might have a very fair general idea where the land lay. In cases of this sort the plaintiff ought not to be required to do a thing which is impossible. He ought only to be required to furnish such proof as is practicable; and, if his proof reasonably establishes that the land is within his patent, and not within any prior grant, the burden shifts. The defendant may show that the prior grant includes the land, although he does not connect himself with it. In this case the defendant offered no evidence. There is no evidence here that any of the older grants covered any part of the land in dispute, and we do not see that the finding of the jury for the plaintiffs is against the evidence or not warranted by it."

I think we have a stronger case here. We have fully as strong a case of affirmative evidence as was had there. I attach no consequence to the fact that there the patentee introduced two surveyors whereas only one was introduced here. It sticks out of this case that plaintiff has gone fully into the matter of previous patents and appropriations covering the land in contest, and that, if it knew of any other, it would have purchased it or introduced it in evidence. That it has not done so counts strongly in favor of the position that the land in contest is covered by the Reid patent. This is not a case where there is no evidence that the land in contest is without the exclusions. We have the testimony of Gibson confirmed by the general considerations alluded to. I shall, therefore, dispose of this case on this basis, and I think I am on solid rock in so doing.

Second. The next proposition I will lay down is that, if the Ross & Currie patent does not cover any portion of the land in contest, it must be held that the corporate defendant is the owner thereof, and the bill should be dismissed. This is so because, with that patent out of the case, I think that the plaintiff has failed to establish that the corporate defendant's ownership of the land in contest under the Reid patent has to any extent been divested by adverse possession. And this is so because down to the corporate defendant's entry on the Strong 100 acres which must be taken to have been under the Reid patent, and down to the bringing of this suit there had never been any entry on the part of the plaintiff and those under whom it claims upon any part of the land in contest. I mean by this such an entry as would have given actual possession by construction of the whole of the land in contest if there had been an intent thereby to take possession thereof. Such entries as were made were on the adjacent

land under patents older than the Reid patent, and hence not covered by it. What I say under this head is also on the basis that the Ross & Currie patent is out of the case.

The first settler in the immediate neighborhood of 'the land in contest was Lewis Campbell. He settled on the south side of Buckhorn "fernist" or "agin" the mouth of Clemons. He had a mill up on Clemons. Then came Wilson Barnett and his son. George W. Barnett, and son-in-law, George Howard. Then came the Carpenters, who stretched from down below the poplar at the lower end of the graveyard on Buckhorn up to the John Carpenter fork of the right-hand fork of Clemons. Then came Ira Noble at the upper end, and James Ritchie and his son, Crockett, at the lower end. I think these various parties succeeded one another. The Barnetts succeeded Campbell, the Carpenters succeeded the Barnetts, and Ira Noble and the Ritchies succeeded the Carpenters. I think, also, that the succession was under each other by purchase. The title papers are largely missing, but I am persuaded that such was the case. Such is the reasonable explanation of the succession. I think, further, that all the settlements and inclosures of these parties were within patents older than the Reid patent. There is trouble here as to Lewis Campbell's settlement opposite the mouth of Clemons. The fanciful suggestion of Gibson which roused the mountaineers does not help us in locating the Lewis Campbell 50-acre patent of date March 27, 1824. Yet I am inclined to think that if the truth were known, and that patent could be located accurately, it would be found to cover that settlement. And after plaintiff and its immediate predecessors from William Smith's heirs down, as to the Ira Noble tract, and from Little and his associates down, as to the Crockett Ritchie tracts, became connected with the title, the settlements, and inclosures occupied by their tenants, with the exception of the small settlement and inclosure made by Strong, which fell to plaintiff after the decision in Crate v. Strong, have all been on this old patented land. The possession acquired in this excepted instance dates only from the surrender made upon that decision, and comes far short of having continued for 15 years. I should also perhaps except the settlement made by John Noble and his sons-in-law on the Crockett Ritchie 496-acre tract. But this too had not continued for 15 years at the time this suit was brought. Such, then, of the settlements and inclosures as had continued for more than 15 years not having been on the land in contest, but outside of it—i. e., outside of the interference between the Reid patent and plaintiff's claims—it must be held that the occupation thereof even with a claim of the land in contest did not give possession thereof. This is in accordance with the doctrine first laid down in the leading case of Trimble v. Smith, 4 Bibb (Ky.) 257. Judge Boyle's opinion therein is a model one, in that it is brief and yet covers the whole ground; i. e., the rule and its why.

The fundamental rule in the law of possession in cases where nothing else appears than that the land involved is not in another's possession is that one entering thereon acquires possession to the extent to which he intends to take possession, and no farther. This being so,

the extent of possession is not radically affected by the extent of the settlement or inclosure. If the intent is to take possession beyond the settlement or inclosure, the possession covers as much outside the settlement and inclosure as is within the intent. The settlement and inclosure may have a bearing on the intent, but it does not otherwise affect the extent of possession. The possession on the outside is deemed to be an actual possession as well as that on the inside of the settlement and inclosure. The difference is that the actual possession on the outside is one by construction and intendment of law, and that on the inside is one in fact. If, in addition to the fact that the land is vacant, it appears that the entry is under a claim embracing land on a part of which the party entering had a right to enter and another part on which it had no right, and the entry is confined to that part on which he had a right to enter, the possession extends no farther than such part. This was the rule that was laid down in Trimble v. Smith. Judge Boyle gave two reasons for it. He first made this general remark, to wit:

"Where there is no adverse possession, there can be no doubt that a man by an entry into a part of a tract may acquire the possession of the whole, provided he may lawfully enter upon the whole."

The proviso was uncalled for. He may acquire such possession by such an entry, though he owns no part of the whole or only a part thereof. It depends on where the entry is made and perhaps in certain cases upon other considerations. He then proceeds to state the first of the two reasons he gives for the rule in these words, to wit:

"But to construe an entry into part to which he has right, to give him possession of another part to which he has no right, would be making an act which was right in itself tortious by construction. This would be wholly unwarranted by any precedent and in direct violation of the principle of law which requires where an act is done which is susceptible of a twofold construction, one of which is consistent with the law and the other not, that the former should prevail."

This reason, as I make it out, looks at the matter from the standpoint of the person making the entry. In such a case it is to be presumed that he had no intention to take possession beyond the part on which he had a right to enter and to which he confined his entry, and hence under the fundamental rule stated he acquired possession that far and no farther. The law will not by construction place him in the actual possession of the part to which he has no right, even though he has entered under an instrument of writing that covers such part as well as that to which he has right. The rule, therefore, looked at from this reason is an illustration of the good opinion the law has of mankind. It always acts on the idea of one's action being rightful unless it is made to be otherwise. The other reason looks at the matter from the standpoint of the person whose rights would be affected by the entry if construed to take in the part to which the party entering has no right. Such a construction would be an injustice to him. Judge Boyle states this reason thus:

"Now as the entry of the defendants in this case upon the part of their tract not within the interference, if construed to give them possession of the land within the interference, would have the effect of divesting the plaintiff

of his right, it is clear that such a construction is contrary to the law as laid down by Coke. Indeed, if such a construction should prevail, a party having right might be divested of his right without any wrong being in fact done him or any possibility of knowing that any was intended to be done."

If I were put to a choice between these two reasons, I would choose the latter. It has an ethical ring. The other is tinctured with artificiality. If it were the sole reason for the rule, then in any case where the presumption of not intending to take possession of the part to which there was no right was rebutted by evidence establishing beyond question that there was such intent it should be held that possession thereof was acquired. That there may be such a case is shown by the evidence in this case. I have not the slightest doubt that the plaintiff and its immediate predecessors by settling tenants on those lands to which they had title as against the corporate defendant intended thereby to take possession of the whole of the land in contest. And, if such were the sole reason of the rule, it would have to be held that they thereby acquired possession thereof. If, however, the meaning of the first reason is that in such a case there is an irrebuttable presumption that there was no intention to take possession of the part to which the party entering had no right, it is but another way of stating the second reason. The presumption is not rebuttable because to permit it to be rebutted by evidence of something short of an entry on the part to which the party entering has no right would bring about the injustice of depriving one of his land without any wrong in fact being done to him or a wrong of such a character that it will likely come to his notice. The rule in Trimble v. Smith has frequently been applied in subsequent decisions, but always with but little, if anything, said as to the reasoning on which it has been based. I gather from it that it is impossible to divest one of his title to land without an entry on it. There may be some limitations as to the extent or place of the entry that will be sufficient to this end. But he cannot be divested when there has been no entry anywhere on his land.

Such, then, is the line of reasoning by which I have reached the conclusion that, leaving the Ross & Currie patent out of consideration, it must be held that the corporate defendant is the owner of the land in contest. The only entries thereon, as for instance the Strong entry which fell to plaintiff and the John Noble entry on the 496-acre tract, had not continued long enough to ripen into title. The other entries were not on the land in contest. They were on land outside of it and adjacent thereto, and the parties entering had the right to enter thereon as against the Reid patent. Such entries, even though accompanied with the intention to take possession of the land in contest and under a claim of ownership, had no effect to gain possession of any part of the land in contest, and no matter how long continued to divest the corporate defendant of its title thereto. There is hardly room to hold that, in case such entries be held to have conferred possession on those under whom plaintiff claims and on plaintiff of the land in contest, the corporate defendant's title has not been divested thereby for want of 15 years continuous adverse possession. As to the Ira Noble 3,600 acres, I do not think that upon such an assumption it can be said that he had 15 years continuous adverse possession there-

of, even though it be assumed further that he marked its boundary in 1862, and thereafter claimed to it and his possession became effective at the time he so marked it and began to claim it.    There was a break in his possession when he sold to Elijah Miller in 1867 and moved to Long Fork, and this break continued until he moved back in 1871 or 1872 under a purchase from his son Lawson, who had bought from Miller.    I think that the contract of sale by Ira Noble to Elijah Miller and by Elijah Miller to Lawson Noble can properly be construed to cover all the old patented land between the upper and lower lines called for, and hence to cover a definite quantity of land.    This is all the land they claimed or they intended to take possession of, and their possession, therefore, was limited thereto.    Upon this severance of possession, that of Ira Noble to the land in contest vanished the same as if he had not sold, but had limited his possession to the old patented land and surrendered possession of the balance.    See West v. McKinney, 92 Ky. 638, 18 S. W. 633.    But to deny him 15 years continuous adverse possession on such assumption it is not necessary to rely on this break.    His adverse possession as against the Reid patent did not begin to run until June 15, 1872, when it emanated, and when he sold out to Smith in 1886, 15 years had not run.    And not only did he not have 15 years continuous adverse possession, but none of the adverse possession that he did have can be added to such as was had after he sold to Smith to make out a 15 years continuous adverse possession.    This is so because there was a break in such adverse possession as he had and as was afterwards had.    The break came March 15, 1885, when he sold out to his son Samuel Noble.    The sale to Samuel was of the old patented land, and by reason of it a break in the adverse possession of the land in contest came about in the way that the previous break did.    So, then, if on the assumption upon which we are proceeding it is to be held that the plaintiff and those under whom he claims had had prior to the bringing of the suit 15 years continuous adverse possession, the beginning thereof must date from the sale of Samuel Noble, in whose deed Ira Noble and Miller and Ritchie joined in 1889 when Samuel Noble took a lease from those under whom plaintiff claims for the entire 3,600 acres.    Between that date and the bringing of the suit is more than 15 years.    And I think on said assumption it must be held that during that time plaintiff and those under whom he claims did have 15 years continuous adverse possession unless it was interrupted by the entry of the corporate defendant on the Strong 100 acres in 1903.    But I do not think that this amounted to an interruption because it was not on plaintiff's possession.    The pulling down of the Strong house and the fence around the garden hardly amounted to an interruption.

As to the two Crockett Ritchie tracts of 1,425 and 496 acres, the case is much stronger than as to the Ira Noble tract for 15 years continuous adverse possession.    His father and he entered in the late 60's and early 70's, and the possession continued without any break until he sold in 1889, a period of over 20 years as to the bulk of said two tracts.

The only ground, then, upon which it can be made out that the corporate defendant's ownership of the land in contest has not been di-

vested by 15 years continuous adverse possession is by denying that plaintiff and those under whom it claims has ever had any possession of the land in contest except so far as it has been conferred by the Strong and John Noble settlements and inclosures which were not of 15 years' duration. I think that this can be successfully denied on the ground which I have fully set forth that the other settlements and inclosures were on the old patented land—land on which the plaintiff and those under which it claims had a right to enter as against the corporate defendant.

Third. The foregoing propositions have been advanced as sound upon the assumption that the Ross & Currie patent was out of the case. I refer to the 10,000-acre patent which emanated October 30, 1789, on survey No. 6,224 dated June 18, 1788. It is now in order that I take position as to this patent. I have reached the conclusion that I must dispose of this case on the basis that that patent is located as shown by Major Wright's plat, and hence covers the bulk of the land in contest. I have reached this conclusion not solely on the ground that the evidence herein drives me to it, but because I think the Court of Appeals of Kentucky by two decisions to which I will hereafter allude has so held. But, though my own conviction is not the sole ground for this conclusion, I can say that my own best judgment is that the conclusion is sound. As this position is so detrimental to defendants, I feel that I must state the line of reasoning which leads me in that direction. That patent calls for a four-sided body of land lying on the waters of the North fork of Kentucky river, Bourbon county, by the name of Buckhorn creek and on the north side thereof; the meanders of that creek for a distance of 1,860 poles being one of its sides. The two sides connecting this creek side with the outer side run a course of N. 45° E. as you go away from the creek, or S. 45° W. as you approach it. The outer side connecting these two sides runs a course S. 45° E. or N. 45° W. according to which way you go, thus forming a right angle at each connection. The distance of the upper side called for is 1,356 poles, and that of the lower 960 poles. And the distance of the outer side is 1,540 poles. Timber is called for at each corner. The beginning corner is at the junction of the upper side with the creek. The timber there called for is a number of spruce pines. From thence the boundary runs down the creek, and from the lower corner around to the beginning. The timber called for at the lower corner on the creek, or the second corner, is a black beech, dogwood, and ironwood; that called for at the third corner, the lower corner away from the creek, is an oak and hickory; and that called for at the fourth corner, the upper corner away from the creek, is a red oak and hickory. The boundary calls also for the lower end of a 10,000-acre survey of Ross & Currie at its beginning corner where are a number of spruce pines.

At the outset, it must be conceded that, if we had nothing to go by except the calls of the patent other than the call for the lower end of a 10,000-acre survey by Ross & Currie in addition to the number of spruce pines as being at its beginning corner, the patent could not readily, if at all, be located. No timber has been identified as that called for at its four corners. Hardly more could be said than that

it calls for a boundary of land binding 1,860 poles or nearly 6 miles somewhere on the north side of Buckhorn creek on which side lies the land in contest. But, as that creek is about 13 miles long, it could be so located, and not cover any portion of the land in contest. There is in evidence another patent which emanated from the state of Virginia the same day—i. e., October 30, 1789—for 10,000 acres to said Ross & Currie, based upon a survey made for them by the same surveyor June 20, 1788—i. e., two days later—numbered 6,226; that of the one in question being 6,224. This survey also calls for a four-sided body of land lying on the waters of North fork of Kentucky river, Bourbon county, known by the name of Buckhorn creek, and on the south side thereof—i. e., the opposite side from that on which the one in question lies—the meanders of said creek for the same distance of 1,860 poles being one of its sides. The two sides connecting this creek side with the outer side run a course of S. 45° W. as you go away from the creek, or N. 45° E. as you approach it and the outer side connecting these two runs a course S. 45° E. or N. 45° W. according to which way you run, thus forming a right angle at each connection. The distance of the upper side called for is 762 poles, and that of the lower 1,162 poles. And the distance of the outer side is 1,540 poles. Timber is called for at each corner. The beginning corner is at the junction of the upper side and the creek, and the timber called for is a buckeye and spruce tree. From them the boundary runs down the creek, and from there around to the beginning. The timber called for at the second corner, the lower corner on the creek, is three sugar trees; that called for at the third corner, the lower corner away from the creek, is a walnut and oak; and that called for at the fourth corner, the upper corner away from the creek, is a cherry and dogwood. This survey also calls for the lower end of a 10,000-acre survey of Ross & Currie at its beginning corner, where are the buckeye and spruce trees. This boundary is, like the other one, not locatable if we confine ourselves to the timber called for, for no timber had been identified as the timber thus called for. But there are reasons for inferring that this patent lies on the opposite side of Buckhorn from the one in question. It is true that the two do not call for the same timber at either their upper or lower corners on the creek. The one in question calls for a number of spruce pines at its upper corner and the other one for a buckeye and spruce tree at its upper corner. And the one in question calls for a black beech, dogwood, and ironwood at its lower corner, whereas the other one calls for three sugar trees at its lower corner. But this may be accounted for by the fact that each calls for timber on its side of the creek. And there may be some significance in the fact that each calls for spruce timber at its upper corner on the creek. The reasons for inferring that these two patents lie opposite each other on Buckhorn creek are these. Each calls for 1,860 poles on the creek. The outer side of both are 1,540 poles. The upper and lower sides of both patents lead from or approach the creek at the same angle. The sum of the two upper sides, to wit, 1,365 + 762 = 2,118 poles, and that of the two lower sides, to wit, 960 + 1,167 = 2,127 poles; the two sums being substantially equal,

185 F.—55

and the small difference being due possibly to some mistake. Putting the two boundaries together gives us a rectangular parallelogram. Both surveys were made by the same man. One was made June 18, 1788, and the other June 20, 1788, and one is numbered 6,224 and the other 6,226. We get, therefore, this much help from this second 10,-000-acre Ross & Currie patent in locating the one in question that the latter is on the opposite side of the creek from the former, so that, if the one can be located, so can the other.

The two are alike, in that each at its beginning or upper corner on the creek calls for the lower corner of another 10,000-acre Ross & Currie survey. If, then, either of the 10,000-acre surveys so called for can be located, both these patents can be located. A 10,000-acre patent is in evidence which it is claimed can be so located on the north side of the creek; i. e., the same side as that on which the one in question is located. And another 10,000-acre patent is in evidence, the reasonable inference as to which is that it lies on the south side of Buckhorn opposite the other one. They both call for Buckhorn creek and 1,759 poles thereon. Though the one emanated to Robert Means and the other to John Reed, each was on a survey made for Ross & Currie. There is then a possibility that in these two surveys we have the 10,000-acre Ross & Currie surveys, the lower ends of which are called for as being at the beginning corners of the patent in question and the one opposite to it. The possibility that they are the two surveys so called for is strengthened, if not turned into a decided probability, by the consideration that they were made by the same surveyor and made by him on the 19th and 21st of June, 1788, and are numbered 6,225 and 6,227. The four surveys are numbered, therefore, 6,224, 6,225, 6,226, and 6,227; i. e., 6,224 and 6,225 on the north side and 6,226 and 6,227 on the south side. They were made, the two on the north side—6,224 and 6,225—June 18th and 19th, and the two on the south side—6,226 and 6,227—on June 20th and 21st. Further considerations in the same direction are that, as in the case of the other two patents, the land covered by each is foursided—the upper and lower sides of each lead from or approach the creek N. 45° E. or S. 45° W. —the outer sides connecting the outer ends of the upper and lower sides of these two patents run a course of S. 45° W. or N. 45° E., thus forming at each connection a right angle, the sum of the length of the upper sides of the two, to wit 1,122 + 1,360 = 2,482 poles, and that of the lengths of the lower sides thereof, to wit, 1,702 + 780 = 2,482 poles, are exactly the same, the lengths of the outer sides of each are exactly the same, to wit, 1,300 poles, and the patents form together a rectangular parallelogram stretching across the creek from southwest to northeast at an angle of 45 degrees. These two surveys thus have exactly the same characteristics as the two others; i. e., the one in question and its opposite can be laid right alongside them. Nothing else appearing, the considerations alluded to are quite persuasive that in these two patents we have the two Ross & Currie 10,000-acre surveys whose lower ends are called for as being at the beginning corners or upper ends of the one in question and its opposite, so that, if the former can be located, there will be no difficulty in locating the

latter. It is to be noted that the two pairs of patents bind on Buckhorn for a little over 11 miles, and, as that creek is about 13 miles long, we have sufficient creek on which to locate them. And, further, as the pair of which the one in question is one are the lower pair, it must to a certain extent cover the land in controversy. There is, however, another consideration that may be said to tend even more strongly towards showing that in this pair of surveys we have the two called for by the pair of which the one in question is one, but I will omit any reference to it until I have considered whether or not that pair of Ross & Currie 10,000-acre surveys can be definitely located. I do this because this consideration has a twofold effect. It not only tends to show that those two surveys are the two called for in the patent in question and its opposite, but also to uphold the location thereof which plaintiff claims is established by the evidence.

The survey on the north side on which the Means patent issued states that its lower end or corner on the creek is at the lower end of a cane bottom and at the point of the ridge where it makes near the creek about 20 poles below a remarkable long rockhouse at two hickories, sugar, and white walnut trees. This corner, therefore, is marked by three things: First, the lower end of a cane bottom; second, the point of a ridge, which point of a ridge had two qualifications, to wit, is near the creek and is about 20 poles below a remarkable rockhouse; and third, two hickories, sugar tree, and white walnut trees. The opposite survey states that its lower end or corner on the creek is at a buckeye, walnut, and hollow sycamore about 20 poles below a remarkable long rockhouse on the opposite side of the river. This rockhouse is unquestionably the same rockhouse called for in the other patent. The timber called for at the two lower corners has not been identified. Timber is called for at each of the four corners of these two surveys as in the case of the other two, and none of this timber has been identified. But on the north side of Buckhorn, about halfway between Cole's fork and Jake's fork, the two forks of Buckhorn next above Clemons fork on which the land in contest mainly lies and emptying into it from the north side; i. e., about three-quarters of a mile above the mouth of Cole's fork there is a bottom, called in a patent which emanated in 1835 "Cane bottom," and having opposite to it and emptying into Buckhorn from the south side a tributary known as Cane branch as far back as any of the witnesses can recollect. At the lower end of this bottom there is a point of a ridge that makes near the creek, and that is about 20 poles below a remarkable long rockhouse. And at this point of a ridge there was standing many years ago hickory, sugar, and white walnut trees, the kind of timber called for as being at this corner of the survey. There is no evidence that this place was ever known as a corner of this or any other patent. But it is very hard to resist the conclusion that it is the corner of the survey on which the Means patent issued. I do not feel called on to make good from the mass of evidence relating thereto that the things above referred to are to be found at that place or arguing that such is the corner of that survey. But I accept all that as so, and will dispose of this case on that basis. These matters were distinctly involved and passed on by the

Court of Appeals of Kentucky in the last of the two decisions above referred to; plaintiff's contention in regard thereto being upheld.

It is now in order to take up the consideration referred to above as having the twofold effect of showing that those are the two surveys so called for and supporting the location thereof which I have accepted and think is established by the evidence. There is in evidence another patent which emanated from the state of Virginia February 24, 1790, to Ross & Currie for 1,000 acres on a survey made by the same surveyors who made the other four on September 10, 1788. It is located on Buckhorn creek. Its beginning corner is two mulberries, a white walnut, and a hollow sycamore, and this corner is said to be at the lower end of a Ross & Currie survey for 10,000 acres. It is not said whether the corner is on the creek or not. From thence the boundary runs to a white oak said to be in Thomas Cartwright's line of his 10,000-acre survey north a distance of 220 poles, near to the mouth of Buckhorn creek, S. 45° W., 400 poles, thence to a red oak, S. 530 poles, thence to a wild cherry, E. 275 poles, and thence to the beginning, N. 600 poles. This survey calls for a well-known natural object, to wit, the mouth of Buckhorn creek, and hence is locatable. Its beginning corner, to wit, the two mulberries, white walnut, and hollow sycamore at the lower end of a survey of Ross & Currie of 10,000 acres is ascertainable. It is to be found by reversing the two calls between it and the mouth of Buckhorn. So doing, takes one, according to plaintiff's surveyor, to a sycamore stump interlocked with roots and sprouts of a mulberry and white walnut trees on the north bank of Buckhorn, the kind of timber called for as being at the beginning corner, and, though according to defendant's surveyor it takes one 75 poles beyond the sycamore stump according to him, the line runs directly through it. The conclusion is irresistible that such is the beginning corner of the 1,000-acre survey and the lower end of the 10,000-acre Ross & Currie survey called for in it. Now the distance between this beginning corner of the 1,000-acre survey and the place where we have located the two lower ends of the 10,000-acre surveys on which the Means and Reid patents issued by the meanders of the Buckhorn is exactly 1,860 poles, the distance of the creek line called for in the patent in question and its opposite. That this is so tends to confirm the conclusion heretofore reached that that place is the lower end of those two surveys, and that they are the two surveys whose lower ends are called for as being at the beginning corners of the patent in question and its opposite. If so, the patent in question is locatable and is to be located as claimed by plaintiff. By so locating it, the beginning corner of the 1,000-acre survey is the lower end of a Ross & Currie 10,000-acre survey. Thus locating it and its opposite, there is to be found at the lower end of its opposite three sugar tree stumps, the timber called for as being there. There is evidence, though not of a very persuasive character, tending to show that spruce pines, the timber called for, were once at the beginning corner of the patent in question, and at its lower corner on the creek there was the timber called for as being there. And so locating these five surveys takes in the whole of Buckhorn from its mouth to its head; the upper lines of the two upper 10,000 sur-

veys extending to the ridge at the head of Buckhorn.  Such, then, is the line of reasoning which tends to drive one to the conclusion that the Ross & Currie patent in question is located as plaintiff claims.

But, before passing on, it is fair to defendants to refer to certain considerations which make against this conclusion.

In the first place, the two upper 10,000-acre patents call for at their upper corners on the creek two maples and an ash on north and south sides of the creek at the lower end on the one side of a 584-acre survey of Jones and on the other of a 581-acre survey of Harrison.  Locating these two patents as we have done carries them to the ridge above the head of Buckhorn.  This fact affects these calls, indicating that those patents should not be so located, or that there is some mistake in the calls.

Again, the Means patent and the one in question on the north side of Buckhorn do not call for the same timber at their common corner, the one calling for two hickories, sugar, and white walnut trees, and the other for a number of spruce pines; nor do the Reid patent and the one opposite the one in question on the south side of Buckhorn call for the same timber at their common corner, the one calling for a buckeye, walnut, and hollow sycamore and the other for a buckeye and spruce tree: nor does the 1,000-acre survey at the mouth of Buckhorn call for the same timber at its beginning corner where is the lower end of a Ross & Currie 10,000-acre survey as is called for at the lower end of the patent in question or its opposite, that survey calling for at its beginning corner two mulberries, a white walnut, and hollow sycamore, and the one in question calling for, at its lower corner on the creek, a black beech, dogwood, and ironwood, and its opposite calling for at its lower corner on the creek three sugar trees.  One would expect to find the same timber called for at the common corners, and it seems strange that it is not.  Besides this, the patent in question makes no reference to the cane bottom or the point of the ridge or the remarkable long rockhouse at its common corner on the creek with the Means patent, and its opposite makes no reference to either as being near its common corner with the Reid patent.  Still, again, though the course of the creek between the two pairs of surveys is not given, from the courses and distances of the other sides which are given, it is possible to tell what the course of the creek at these points is, and, though the course between the upper pairs thus ascertained conforms substantially to the real course of the creek as it is locating those two patents as we have done, the course between the lower pair—i. e., the one in question and its opposite thus ascertained—does not conform to the real course of the creek as it is locating them as we have done.  The course according to the survey is nearly north; whereas, as it really is it is nearly west.  But this is not all.  There is in evidence in addition to these five patents based on Ross & Currie surveys, six other patents based on Ross & Currie surveys made by the same surveyor the same year the first were made—i. e., in 1788—and some of them at the same time of the year.  These six all call for Buckhorn creek.  They are as follows, to wit:

(1) One for 15,000 acres, survey for which was made September 8, 1788.  Its beginning corner is at a large branch of Buckhorn.  It lies

on both sides of the creek, the lower side crossing it about halfway, and calling for four sugar trees and an oak at a bottom where it crossed the creek.

(2, 3) Two surveys of 10,000 each on opposite sides of the creek and binding upon each other. They were both made May 25, 1888. The one on the north side of the creek calls to begin at a bottom at four sugar trees and an oak at the lower end of a 15,000-acre survey and the one on the south side of the creek calls for some spruce trees where the hills come near the creek at a bottom at the lower end of a 15,000-acre survey. They bind on the creek 1,565 poles, or not quite 5 miles. There would seem to be no question but that the 15,000-acre survey called for by them is the first one, and that they bind on its lower side.

(4, 5) Another pair of surveys on opposite sides of the creek and binding on each other; the one on the north side containing 6,000 acres and that on the south side 4,000 acres. They were made September 8, 1788, the same day when the 15,000-acre survey was made. They bind on the creek 1,110 poles or a little under 3½ miles. They do not call for adjoining surveys at either end. These five surveys constitute three rectangular parallelograms. The 15,000-acre survey forms one by itself and each of the pairs constitutes one. They are like the two rectangular parallelograms formed by the two pairs of 10,000-acre surveys, including the one in question, in that they stretch across Buckhorn from southwest to northeast at an angle of 45 degrees.

The sixth survey is a small one, to wit, for 584 acres, the same quantity contained in the Jones and Harrison surveys, the lower end of which are said to be at the upper corners on the creek of the upper pair of the five. It binds on the north side of the creek of the upper pair of the five. It binds on the north side of the creek a distance of 480 poles or 1½ miles. Its beginning corner, the upper corner on the creek, is a cluster of sugar trees, said to be at the lower end of a 4,000-acre survey of Robert Buckner, and its lower corner is two maples and one ash, the same timber called for at the lower corner of the Jones and Harrison surveys of 584 acres each. It is a four-sided body of land, and the corners of its upper and lower sides from the creek are each due north and the corner of the outer side is due east and west.

These six surveys call for nearly 17 miles of creek, and, if they are on the same creek as the other five which call for 13 miles of creek, the creek on which all eleven are located must be at least 30 miles long. And they all call for the same creek, and give its name as Buckhorn. But this is not the only basis for connecting them together, and locating them on the same creek. The strange thing is that they can be so connected together that the lower corners of the upper surveys call for the same timber called for at the upper corners of the lower surveys as I will point out. To accomplish this, the 15,000-acre survey is placed as the upper one of all. It lies on both sides of the creek, and its lower side crosses the creek about midway, and at the crossing on the north side calls for four sugar trees and an oak at a bottom. Then comes the pair of 10,000-acre surveys whose dividing line consists of 1,565 poles of nearly 5 miles of the creek. The upper or beginning corner of the one on the north side is 4 sugar trees and an oak at a bottom, the same timber called for by the 15,000-acre survey as being on the north side

of the creek where its lower side crosses it, and this timber is said to be at the lower end of a 15,000-acre survey as being on the north side of the creek where its lower side crosses it, and this timber is said to be at the lower end of a 15,000-acre Ross & Currie survey. The upper and beginning corner of the one on the south side calls for some spruce trees at a bottom on the lower end where the hills come near the creek at the lower end· of Ross & Currie's 15,000-acre survey. That survey makes no mention of the timber on the south side of the creek where its lower side crosses it. There would seem to be no possible room to doubt that these two 10,000-acre surveys come next to the 15,000-acre survey.

The lower corner on the creek of that one of these two last-mentioned 10,000-acre surveys which lies on the north side as called for is a buckeye, lynn, and spruce tree at a remarkable place of hanging rocks and the lower corner on the creek of the opposite one on the south side as called for is a large cluster of spruce trees at a remarkable place of hanging rocks. The upper or beginning corner of the survey in question is a number of spruce pines at the lower end of a 10,000-acre Ross & Currie survey, and of its opposite is a buckeye and spruce tree at the lower end of a 10,000-acre survey of Ross & Currie. If we suppose that a mistake was made here, and that the buckeye and spruce trees called for by the survey on the south were on the north side and the number of spruce pines called for by the survey on the north side, the one in question, was on the south side, the upper and lower surveys on the north side call for the same timber at their common corner, and those on the south side do likewise. The upper survey on the north side calls for a buckeye, lynn, and spruce tree, and the lower survey on that side, the one in question, will call for a buckeye and spruce tree; the lynn having been omitted. And on the south side the upper survey calls for a large cluster of spruce trees, and the lower survey will call for a large number of spruce pines. Such a mistake is not unlikely. And so placing the survey in question and its opposite has the beginning corner of each at the lower end of a 10,000-acre Ross & Currie survey. No mention is made, however, in the lower surveys of the remarkable place of hanging rocks.

Going on down the creek, we have the lower corner on the creek of the 10,000-acre survey in question at a black beech, dogwood and ironwood and of its opposite at three sugar trees. The upper or beginning corner of the 6,000-acre survey on the north side is a black beech, dogwood, and sourwood, thus conforming exactly to the lower corner of the upper survey, except that a sourwood is substituted for an iron-·wood. The upper or beginning corner of the 4,000-acre survey opposite the 6,000-acre survey is three sugar trees exactly the same timber as at the lower corner of the upper survey. The lower corner on the creek of the 6,000-acre survey is three sugar trees and of the 4,000-acre survey is a sugar tree. The upper or beginning corner of the 584-acre survey is a cluster of sugar trees at the lower end of a 4,000-acre survey, said to be a survey of Robert Buckner. The lower corner on the creek of the 584-acre survey is two maples and an ash and the upper corners of each of the two 10,000-acre surveys on which the Means and

Reid patents issued is two maples and an ash, which are located at the lower end of a 584-acre survey; the only difference being that this survey is said to be a survey of Robert Buckner and the others to be surveys of Jones and Harrison. And, lastly, we find that the lower corner on the creek of the Means patent is two hickories, sugar, and white walnut trees, and of its opposite the Reid patent is a buckeye, walnut, and hollow sycamore, and that the upper and beginning corner of the 1,000-acre survey is two mulberries, a white walnut, and a hollow sycamore. No reference, however, is made in the latter to a cane bottom or a point of a ridge or a remarkable long rockhouse. But the call for the lower end of the 10,000-acre Ross & Currie survey is met.

It is certainly somewhat remarkable that these 11 surveys can be so readily connected together. The tendency of this is to make out that none of these 11 surveys, including the one in question, is on our Buckhorn. There are other features tending in the same direction. The fact that the surveys on the opposite sides of the creek do not call for the same timber at their upper and lower corners is thought to indicate that the stream on which they lay is a wide one, that it is frequently referred to in the surveys as a river being of the same import, which is not the case with Buckhorn. Again, the course of the creek called for considered in its entirety is not the same as the course of our Buckhorn. And still further the plats accompanying the surveys show the streams and tributaries, and they do not conform to the tributaries of the Buckhorn on which the land in contest is located. By so arranging and connecting together these 11 surveys, we have a stream that is not the Buckhorn either in length, width, course, or tributaries.

But there is something to be said against so arranging and connecting these 11 surveys. By so doing, they are made to conflict with each other greatly. In two places they are piled on each other three deep. Again, the plats of five of these additional surveys—i. e., all except the 584-acre survey—call for Troublesome, and not for Buckhorn, whereas the plat of that survey and the plats of the five surveys, including the one in question and its opposite, all call for Buckhorn, and the Means and Reid patent surveys call for a 584-acre survey at their upper corners. Besides, there is no evidence of any other Buckhorn than this Buckhorn, and there was never a time within the recollection of any one when it was not known as Buckhorn.

Such, then, are the considerations bearing pro and con on the question whether the Ross & Currie patent for 10,000 acres on survey No. 6,224 dated June 18, 1788, is located as claimed by plaintiff, and hence covers the main body of the land in contest. On the whole, as I have stated, my best judgment is that it so located and does so cover. I cannot say that I feel absolutely sure of this. But, as I have also indicated, I feel that I am relieved of any responsibility as to the truth here by the decisions of the Court of Appeals of Kentucky in the cases of Crate v. Strong (Ky.) 69 S. W. 957; Taulbee v. Buckner's Adm'r (Ky.) 91 S. W. 734. In the earlier case, it was held that the land then in contest a part of that in contest here was covered by said patent. The reasoning by which it reached that conclusion is not giv-

en. But in the later case it went into the matter fully, and held that it is located as contended here by plaintiff. There the controversy was not between these parties. Neither one of the parties here was a party there. And it is not entirely clear that these 11 surveys were before that court or that defendant's position was presented there as fully and forcibly as it has been here. Reference is made in the opinion to six surveys only. They are the 5 originally considered here and the 15,-000-acre survey which defendants place at the head of the 11. The Court of Appeals seemingly held it to be above the other five, an impossible location. But, notwithstanding these considerations, I think I should follow that decision, even though I might entertain some doubt as to its soundness, or even think otherwise. My experience has been such as to make me hesitate not to follow blindly any decision of the Court of Appeals on a matter of local law. On three occasions I have not done so, and I have been reversed because of it. In each instance I thought a consideration of all the Court of Appeals had held from the beginning permitted me to decline to follow it in the position taken in a later decision in a case where the matter had not been fully presented to it, and still so think, and that my position was sound. But hereafter, if its decisions are not to be so followed, the appellate court must blaze the way, not this court.

There remains, however, a problem in this connection which must be solved before we are ready to pass on from this phase of the case, and one that does not seem to have been passed on by the Court of Appeals in these cases or considered by it, but which was involved therein. The problem grows out of the fact that the survey does not close if one restricts himself to its calls as they are. There is no trouble on the basis upon which we are proceeding in locating the first line. It begins at the point 20 poles below the remarkable long rockhouse at the lower end of the cane bottom where the point of the ridge comes near the creek, and runs thence down the creek, with its meanders, 1,860 poles, or nearly 6 miles, to the sycamore stump. These two corners—the first two—are extant and the lines between them—a natural monument—is extant also. Of course, it will be understood that I do not mean that the corners called for in the patent and survey are extant. They are not. But we have already reached the conclusion that those two corners were where the two corners of the adjoining surveys were and they are extant, and it is the same as if they had been actually called for. The trouble begins after you leave the sycamore stump. The other two corners are nonextant. The oak and hickory called for as being at the lower outer corner and the red oak and hickory called for as being at the upper outer corner are not to be found. They never had any existence except in the imagination of the surveyor. The other three lines are therefore not locatable except by following their courses and distances. The calls are as we have seen from Sycamore stump N. 45° E., 960 poles, thence S. 45° E., 1,510 poles, and thence S. 45° W., 1,356 poles, to the beginning. Following these calls will not take one to the beginning. The third line at 888 poles from its beginning will strike a line running N. 45° E. from the beginning corner a little less than 50 poles therefrom,

and continued the length called for, to wit, 1,540 poles, will take one 652 poles on the south side of the creek and the fourth line from the termination of the third line will take one in a southwesterly direction still further away from the beginning corner. Such is the result obtained by following the calls in the order given. No better result is obtained by following them in their reverse order. So following does not bring us back to the creek or anywhere near there. In neither way do we get a body of land inclosed by the lines called for in the patent or portions thereof. Unless, then, the survey can in some way be made to close, the patent is void and out of our way. And it cannot be closed arbitrarily. It can only be closed on a reasonable basis. What we have then is a four-sided body of land, with only one of its sides known. With that much given how can and how should the other three sides be located? The Court of Appeals of Kenutcky has had such a problem before it a number of times, and it has always been able to solve it and locate the patent involved. It has never held that the problem in a case that has come before it could not be solved and because of this the patent should be overthrown. The cases I have in mind are the following, to wit: Beckley v. Bryan, Ky. Dec. 91; Bryan v. Beckley, Litt. Sel. Cas. (Ky.) 91, 12 Am. Dec. 276; Preston v. Bowmar, 2 Bibb (Ky.) 493; Calvert v. Fitzgerald, Litt. Sel. Cas. (Ky.) 389; Blight v. Atwell, 4 J. J. Marsh. (Ky.) 279; Mercer v. Bate, 4 J. J. Marsh. (Ky.) 334. I have placed these cases in their chronological order. Bryan v. Beckley, though reported after Preston v. Bowmar, was decided before. I had such a problem before me in Davis v. Com. L. & L. Co. (C. C.) 141 Fed. 711, 740, and, though the Appellate Court reversed me, it was not because of any error in dealing with this problem. I therefore start out with the idea that this problem in this case is solvable, and that a location of the survey can be made that squares with the demands of sound reason.

Plaintiff's counsel seem to think that in every such case the problem is to be solved by locating the three lines according to their courses, and extending or contracting the distances so far as necessary to enable this to be done. This is upon the idea that as between courses and distances the latter must always give way. But following this out gives us here—as probably in most if not all instances—two possible locations. One is to run the third and fourth lines reversely and in reverse order, the fourth according to course and distance called for, and the third according to course only so far as it will be intersected by the second line run according to course, but extended so as to intersect the third line so run. By so doing each line is located according to course, the second line is extended from 960 poles to 2,363 poles, and the third line is shortened from 1,540 poles to 888 poles. The fourth line alone is located according to course and distance called for. The other is to run the second and third lines directly and in the order called for, the second according to course and distance called for, and the third according to course 888 poles, until it strikes the fourth line run reversely according to course 50 poles from the beginning. By so doing each line is located according to course called for, the third line is shortened from 1,540 poles to 888 poles, and the fourth

line from 1,356 poles to 50 poles. The second line alone is located according to course and distance called for. In each instance the third line is shortened. In one instance the second is lengthened and in the other the fourth is shortened.

Proceeding along this line, then, we have two possible locations, and choice has to be made between them. In the case of Bryan v. Beckley, where it was held that the court was limited to a choice between two possible course locations, it was further held that choice should be made of the one which was most against the grant. If we are bound to do this here, then the last of the two possible locations will have to be taken. It may be urged that choice of this location does not have to be made here because most against the grant, and that for two reasons. That location gives a figure that does not conform to the plat of the survey. It gives an acreage much less than the survey calls for. On the other hand, the other location gives a figure conforming more nearly to the plat and an acreage substantially that called for by the survey. And it seems to me that there is force in this suggestion. One has to be careful in applying the principle that, as between two possible locations, the one that is most against the grant should be chosen. This principle applies only in case everything else is equal. And here everything else is not equal. The first location has in its favor what the other does not in that it gives substantially the figure of the plat of the survey and the acreage called for thereby.

But it is not sound that in every such case as we have here the problem is to be solved by locating the three lines according to their courses extending or contracting the distances so far as is necessary to enable this to be done. The only case that supports this doctrine is Bryan v. Beckley. I dealt with that case quite extensively in Davis v. Commonwealth L. & L. Co., and I shall not repeat here what I said there. It was overthrown by Preston v. Bowmar, decided a year or so after, and would never have been reported had not Littell come across it in preparing his Select Cases. In this way it came to be reported later than Preston v. Bowmar, though decided earlier. It was because it was never thought that it would see the light of day that no express reference was made to it by Judge Boyle in Preston v. Bowmar, though what he says shows that he had it distinctly in mind. Preston v. Bowmar is followed and approved by Calvert v. Fitzgerald, Blight v. Atwell, and Mercer v. Bate. In Davis v. Commonwealth L. & L. Co. I followed it also. It is to be gathered from them that, if in any given case the call in the survey for the line whose actual course and distance is known because of the extant corners which it connects does not conform thereto as to either course or distance thus showing a mistake to have been made in the call, the same correction that is made in the call to make it conform to the actual facts will be made in the opposite line. This is on the idea that the mistake affected the call of the opposite line as well as the call of that line, and correction should be made in both lines. If the call of the known line alone is corrected, it and its opposite will not bear the same relation to each other as before. But by correcting both to the same extent they are brought into the same relation to each other which they theretofore had. This seems reason-

able to me. Now in this case it is certain that the surveyor did make a mistake as to the true course of the creek line. He made no mistake as to its distance. The true course of the creek is ascertainable and known. As, however, no course is called for in the survey, it may be thought that it is impossible to tell what he thought its course to be so as to determine whether or not he was mistaken in this particular. But what he thought the true course to be is ascertainable, as I have heretofore stated, from the fact that we know exactly the point of the parallelogram stretching across Buckhorn from southwest to northeast at the angle of 45 degrees at which Buckhorn entered it, and exactly the point at which it left it, and from this data we are able to tell what he thought the true course of Buckhorn to be. And from this data we know that he thought the course ran considerably more northwardly than it actually does.

If, then, we are to follow the rule laid down in Preston v. Bowmar and approved in the subsequent decisions, and followed by me in Davis v. Commonwealth L. & L. Co., this survey will have to be located in this way. Run the fourth line reversely according to call and the second line directly according to call, and connect the outer ends of the two calls by the third line. By so doing the same correction as to course is made in the outer line that has to be made in the creek line. But I am much persuaded that this rule is not to be followed in this case. Allowance is to be made for the mistake in another way. It is clear that the surveyor intended to construct out of the survey in question and its opposite a rectangular parallelogram stretching across Buckhorn from southwest to northeast at an angle of 45 degrees. He had such rectangular parallelograms on his brain. He constructed four other such parallelograms, one other stretching across Buckhorn above the one in question and three on Troublesome. No location, therefore, can be tolerated that does violence to this intention. What one is engaged in doing in such a case as we have here is locating the patent according to the presumed intent of the surveyor, and, whilst the location made may have a degree of artificiality in it, it must not involve that which we know certainly the surveyor never intended. How, then, is allowance to be made for his mistake, and yet keep within his intention? I think in this way. The upper and lower ends of the creek line were actually closer together from a north and south standpoint than the surveyor thought them to be. In removing the lower end from where he thought it to be to where it actually was whilst the distance between the two remained the same, they are brought nearer together from a north and south standpoint—more nearly on an east and west line. It is reasonable to conclude that this mistake affected the length of the opposite line; i. e., the third or outer line. Its north and south ends were further apart, and it was longer than would otherwise have been. A correction of the mistake should not be confined to the creek line. It should take place in the outer line also. And the mistake is corrected by shortening it, and the extent to which it should be shortened is fixed by extending the second line on the course called for until it intersects the third line on the course called for. The acreage lost by narrowing this part of this parallelogram is made up by

its lengthening. In so locating the survey, regard is had to the mistake that was made and its effect on the creek and outer lines both, and it is corrected in both. The surveyor's intent to have a rectangular parallelogram is respected, the courses of all three lines is preserved, the acreage is substantially that of the patent, and a figure conforming substantially to that of the plat of the survey is had. Such location is a reasonable one and the only reasonable one that can be made. I therefore think that such is the true location. This is the location on Major Wright's plat, and it covers the bulk of the land in contest. It is for these reasons thus given in much detail that I have reached the conclusion that this case should be disposed of on the basis that the Ross & Currie patent in question covers the bulk of the land in contest: i. e., so much thereof as is shown by Major Wright's plat.

Fourth. Having reached the conclusion stated and attempted to be upheld in the foregoing division of this opinion, I am prepared to take another step in advance; that is, that the plaintiff is the owner of such of the land in contest as is covered by the Ross & Currie patent, and that whether or not its chain of title can be traced back to the patentee or not. This is so because at the time the deed was made to it by the Kentucky Union Company, to wit, August 1, 1905, the Ross & Currie title to so much of the land in contest as was covered by that patent had been divested and a fee-simple title vested in the plaintiff by 15 years continuous adverse possession. That patent not only covered the land in contest, but it also covered the adjacent patents, elder to the Reid patent, to which I restricted the possession under the second head on the basis that the Reid patent covered the whole of the land in contest and the Ross & Currie none of it. The fact that they were covered by the Ross & Currie patent rendered them void, and the entries under them and within their boundaries were wrongful as to the Ross & Currie patent. The entire aspect of the possession made under them is changed by this circumstance. From being rightful possessions, they become wrongful; and there was nothing to prevent them being extended by construction and intendment of law to the entire limits of the Ross & Currie patent except want of an intention to extend them beyond the limits of these patents junior as to Ross & Currie and elder as to Reid. For want of such intention, the possessions of Campbell, the Barnetts, and the Carpenters did not extend further. That of Ira Noble extended at least to so much of his marked boundary as was covered by the Ross & Currie patent, if he marked the boundary and claimed to it as urged by the plaintiff. Likewise that of the Ritchie extended at least to so much of the 1,425 and 496 acre tracts as was covered by the Ross & Currie patent. I do not think that there can be any question that at least from 1869 they claimed the whole of those two tracts, and had possession thereof, except possibly so much of the 496-acre tract not covered by the Ross & Currie patent. In this connection, see the case of Stith v. Jones, 7 Dana (Ky.) 433.

The only question is whether there was 15 years continuous adverse possession. It is certain that Ira Noble did not have 15 years continuous adverse possession because of the break during the Elijah Miller and Lawson Noble interim. Nor can any of his adverse possession be

tacked on to that which began when Sam Noble became Little's tenant in 1889. This is so because of the break between March 15, 1885, and 1889, during the Sam Noble interim. But it is not necessary for plaintiff to avail itself of Ira Noble's possession to any extent in order to give it 15 years continuous adverse possession before bringing this suit. If the adverse possession of which it can avail itself first began in 1889—and it did so begin—then it had 15 years continuous adverse possession before suit brought as to so much of the Ira Noble tract as was covered by the Ross & Currie patent. As to the Ritchie tracts, the plaintiff is not limited to this time. It can avail itself of the Ritchie possession from 1869. There was no interruption of this possession by the corporate defendant's entering on the Strong 100 acres in 1903, or what it afterwards did as to the Strong settlement on the land in contest. For these reasons, I think it must be accepted that before the Kentucky Union deed plaintiff had acquired title to so much of the land in contest as was covered by the Ross & Currie patent. It is not material, therefore, to determine whether it by that deed acquired a paper title thereto, though the criticisms made in regard thereto seem to have been disposed of by the Court of Appeals.

Fifth. It remains to take position as to that portion of the land in contest not covered by the Ross & Currie patent. This portion I have already held is covered by the Reid patent. The conclusion I have reached here is that the plaintiff has divested the Reid title as to so much thereof as is within the Ritchie 496-acre tract; but not to that portion within the Ira Noble 3,600 tract. The way I make this out is this: We hark back to the rule in Trimble v. Smith and its reasons. There is a modification of this rule, first announced and applied in Beeler v. Coy, 9 B. Mon. (Ky.) 312, and applied again in Keaton v. Sublett, 109 Ky. 106, 58 S. W. 528; Buckner v. Kirtland, 33 Ky. Law Rep. 603, 110 S. W. 399. That modification is this: If that part on which the party entering has no right to enter is not another person's land, but is the commonwealth's land, he acquires possession to all the land covered by the instrument or claim under which he enters, both that on which he has a right to enter and that on which he has no right to enter; and still further the possession so acquired is not affected by the subsequent emanation of a patent from the commonwealth to some person, but at once becomes adverse to such patent, and ripens into title if permitted to run the statutory period from the date of the emanation thereof. This modification seems to be accepted as a matter of course with very little being said as to its rationale. Possibly it is to be accounted for on some such line of reasoning as this. Possession of the commonwealth's land is not a wrongful or tortious possession, and cannot do it any harm. There is therefore no reason for presuming that there was no intent to take possession to the extent of the claim, and, as possession of land not in possession of another is always determined by the intent, it should in such a case be construed to go to the limit of the claim under which the entry is made.

Now for the application of this modification here. And first as to the Crockett Ritchie tract. The Ben Carpenter deed under which the

Ritchies held covered so much of the 496-acre tract as was outside of the Ross & Currie patent as well as that which was within. It was made in 1869, before the Reid patent emanated, which was in 1872. The Ritchies, therefore, acquired possession of the whole of the 496-acre tract, to wit, their possession was not affected by the emanation of the Reid patent, but on its emanation became adverse thereto and continuing for more than 15 years ripened into title. Then as to the Ira Noble 3,600-acre tract. Though Ira Noble may have acquired possession of so much of that tract as was outside of the Ross & Currie patent as well as that which was within it by action on his part before the Reid patent emanated, nothing can be made out of it because of the breaks during the Elijah Miller and Lawson Noble and the Sam Noble interims. The only possession as to this tract which can be availed of began in 1889, when Sam Noble became Little's tenant. The Reid patent had long before emanated. And though that entry was wrongful as to Ross & Currie, and hence there may be no reason for presuming that the entrant did not intend to do an additional wrong to Reid, yet Judge Boyle's other reason applies in full force. It would be an injustice to divest the Reid title without any wrong having been done in fact.

It is possible that I may have missed it here. I am conscious of there being a considerable degree of artificiality in this distinction between so much of the land in contest outside of the Ross & Currie patent as is covered by the Ritchie 496-acre tract, and so much of it as is covered by the Ira Noble 3,600-acre tract, and, when I get into the artificial, I am never sure of my standing. Besides, I have by this time become dreadfully tired of this case, and am conscious of a desire to get rid of it. This may have led me to overlook something. If, then, either side thinks that the truth has escaped me here, it is its privilege to try to set me right. It is to be noted before concluding that the Court of Appeals has twice held that the plaintiff had acquired title by adverse possession of a certain portion of the land in contest. This it did in the cases of Crate v. Strong, 24 Ky. Law Rep. 710, 69 S. W. 957; Taylor & Crate v. Burt & Brabb L. Co., 33 Ky. Law Rep. 191, 109 S. W. 348. In neither of these cases, however, was any portion of the land in contest outside of the Ross & Currie patent involved. This concludes this diffuse opinion. Every statement may not be exactly accurate, but I am satisfied that the main positions taken are sound.

Decree can be prepared and entered accordingly if there is nothing further to be said.